Ardith CAVALLO, Plaintiff,

v.

STAR ENTERPRISE, et al., Defendants.

Civ. A. No. 94–1499–A.

United States District Court,
E.D. of Virginia,
Alexandria Division.

July 10, 1995.

Mark C. Hayes, Law Offices of Mark C. Hayes, P.C., Alexandria, VA, Donnell R. Fullerton, Donnell R. Fullerton, P.C., Fairfax, VA, John E. Drury, Law Offices of John Drury, Washington, DC, for plaintiff.

John A.C. Keith, Blankingship & Keith, Fairfax, VA, Richard E. Wallace, Jr., Howrey & Simon, Washington, DC, for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

In this toxic tort case, the Court must exercise its "gatekeeping responsibility" to assess whether Plaintiff's proffered expert opinions on causation are admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Plaintiff here alleges chronic injury from exposure to aviation jet fuel ("AvJet") vapors, and like many toxic tort cases, the central dispute is causation. Specifically, the question presented is whether the opinions of two experts that Plaintiff's exposure to AvJet caused her various chronic respiratory illnesses are admissible where no study or published literature links AvJet vapors to Plaintiff's claimed illnesses and where the experts fail to establish why studies showing a correlation between exposure to other chemicals and much less significant illnesses support their proffered conclusions in this case.

### I. Statement of Facts[1]

Plaintiff Ardith Cavallo is a resident of Fairfax, Virginia. Late in the evening of December 9, 1991, Ms. Cavallo and her husband, Lawrence Cavallo, dined at a Chinese

---

1. For purposes of disposing of the motions at bar, the facts in this case, many of which are hotly disputed, are presented here in the light most favorable to Plaintiff. *See Matsushita Elec.* *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

restaurant. The couple enjoyed a leisurely dinner and some late-night conversation with the proprietors. Then, shortly after midnight, the Cavallos left the restaurant and proceeded across the parking lot to their car. On the way to the car, the Cavallos noticed an odor in the air, which Mr. Cavallo identified as an oil smell. By the time the couple reached the car, a process which consumed approximately five minutes, Ms. Cavallo had begun to experience severe burning in her eyes, a sensation of fullness in her left ear, and irritation in her throat. Mr. Cavallo apparently did not experience these effects.

The restaurant, it appears, is located in a shopping mall just 500 feet from a petroleum distribution, mixing and transfer terminal ("the Star facility") owned and operated by Defendant Star Enterprise ("Star").[2] Beginning either late in the evening of December 9, 1991 or very early the following morning, approximately 34,000 gallons of AvJet accidentally overflowed from a storage tank located at the Star facility. While the parties dispute the exact timing of the spill, they agree for purposes of these proceedings that the spill was either ongoing or had already concluded at the time the Cavallos crossed the restaurant parking lot. According to Ms. Cavallo's air modeling expert, Dr. Robert Haberlein, the spill resulted in airborne emissions of hydrocarbon vapors in the restaurant parking lot, at a maximum, "worst-case" concentration of 61 milligrams per cubic meter ("61 mg/m$^3$") (Haberlein Rpt., at V–1). Although Star's air modeling expert opines that this figure is seriously flawed and overstates the possible concentration of AvJet vapors in that area by a factor of 1000, Star concedes the 61 mg/m$^3$ level of exposure for purposes of the motions at bar.

On reaching her home, which is located approximately one half mile from the Star facility, Ms. Cavallo applied boric acid to her eyes in an effort to sooth them. Although she continued to suffer pain and discomfort, Ms. Cavallo did not seek emergency medical treatment. Rather, she waited nine days before seeking medical attention for her ailments. On December 19, 1991, she consulted Dr. Joseph Sabri, an otolaryngologist.[3] According to Dr. Sabri, Ms. Cavallo complained of mild congestion, tinnitus,[4] dizziness and headaches, all of which she believed were related to the AvJet spill. After examining Ms. Cavallo and finding no physical symptoms, Dr. Sabri diagnosed her with vasomotor rhinitis, which he explained was a "[s]tuffy nose or a cold." (Sabri Tr., at 16–17). He then prescribed Advil and warm showers. Ms. Cavallo followed this advice for several months, but grew frustrated when her symptoms persisted and consulted another physician, Dr. Richard Rosenthal, on May 4, 1992. According to Dr. Rosenthal, who specializes in immunology and allergies, Ms. Cavallo described her symptoms at that time as dizziness, eye irritation, a stuffy nose, and postnasal drip. Following his physical examination, Dr. Rosenthal diagnosed Ms. Cavallo with conjunctivitis, or eye redness, but detected no pulmonary problems or sinusitis.

Ms. Cavallo's symptoms continued, and on June 30, 1993, she consulted another otolaryngologist, Dr. Neeraj Gupta. Although Dr. Gupta's physical examination of Ms. Cavallo revealed no significant pathology in her upper respiratory system, a CAT scan performed on July 1, 1993 disclosed what Dr. Gupta termed "acute possible chronic sphenoid sinusitis," which he considered to be "close to a medical emergency." (Gupta Tr., at 21–22). To treat the sphenoid sinusitis, Dr. Gupta prescribed antibiotics and nasal spray. The treatment apparently worked, as a second CAT scan performed three months later revealed that Ms. Cavallo's "sinusitis ha[d] resolved or almost completely resolved," (Gupta Tr., at 26), thereby rendering further antibiotic treatment unnecessary. Dr. Gupta also performed another physical exam, the results of which were normal.

---

2. Star is a joint venture partnership. The joint venture partners, also defendants in this case, are Texaco Refining and Marketing (East), Inc. and Saudi Refining, Inc. For convenience, all three defendants are referred to collectively as "Star".

3. An otolaryngologist is an ear, nose, and throat specialist.

4. Tinnitus is defined as "[a] sound in the ears, as buzzing, ringing, or whistling, caused by a defect in the auditory nerve." *Webster's II New Riverside University Dictionary* 1212 (1984).

Nonetheless, Ms. Cavallo continued to complain of "nonspecific" symptoms, such as nasal congestion, postnasal drip, eye irritation, facial pain, headaches, and fullness of the ears. (Gupta Tr., at 27). Then, as now, these symptoms tended to abate when she left the vicinity of the Star facility, but renewed upon her return.

Finally, on July 5, 1994, Ms. Cavallo consulted yet another physician, Dr. Joseph Bellanti, an immunologist who is her current treating physician and whom she has retained to testify as an expert in this case. Following a physical examination, Dr. Bellanti determined that Ms. Cavallo suffered from postnasal drip, a swollen eye, frontal pain, conjunctivitis, a stuffy nose, acute sinusitis, and bronchitis. In his written report, Dr. Bellanti concludes that Ms. Cavallo has developed chronic sphenoid sinusitis and pulmonary dysfunction, illnesses he believes were directly caused by Ms. Cavallo's exposure to petroleum vapors from the AvJet spill in December 1991. Furthermore, Dr. Bellanti concludes that her exposure to AvJet vapors on the night of the spill has "sensitized" her to various volatile organic compounds, including petroleum vapors, as well as certain household chemicals found in products such as Windex and aftershave lotion. Dr. David Monroe, a toxicologist retained by Ms. Cavallo as another expert in this action, agrees that her conjunctivitis and sinusitis were caused by the Avjet spill and also concludes that she has developed an increased sensitivity to various chemical irritants as a result of the spill.[5] It is these two opinions that are the focus of the pending motions.

The Cavallos brought this suit against Star on November 14, 1994, alleging injuries under four separate counts. Three of the counts, Counts Two through Four, have already been dismissed in a prior proceeding before Judge Bryan.[6] Only Count One remains. In this count, Ms. Cavallo claims that Star was negligent in permitting the December 1991 AvJet spill, and that her chronic illnesses are a direct result of her exposure to vapors from that spill. She seeks damages for personal injury (including chronic conjunctivitis, sinusitis, pulmonary disease, and increased sensitization to petroleum hydrocarbons),[7] impairment of earning capacity, lost business profits, medical expenses, pain and suffering, as well as punitive damages.

Star now brings two motions. The first is a motion in limine to exclude the expert testimony of Drs. Bellanti and Monroe on the causation issue. Relying on the principles outlined in *Daubert* and its progeny, Star argues that neither expert grounds his conclusion of causation on scientific tests or literature linking the chemicals to which Ms. Cavallo was allegedly exposed, and at the levels and duration of purported exposure, to the injuries she claims to have sustained. Indeed, Star claims, their opinions run *counter* to all available published studies on the effects of AvJet or kerosene at the alleged level of exposure. As such, Star contends, their opinions are not founded on a scientifically valid methodology and are impermissibly speculative. In response, Ms. Cavallo points out that in forming their conclusions of causation, both experts relied on published studies involving the effects of other volatile

---

**5.** Unlike Dr. Bellanti, however, Dr. Monroe has no opinion regarding whether Ms. Cavallo's alleged chronic pulmonary disease resulted from the AvJet spill.

**6.** The tortious conduct alleged in those three counts involved the continued release of petroleum hydrocarbon vapors from the Star facility during and after Star's clean-up efforts, efforts which the Cavallos alleged to be inadequate and harmful. Specifically, Count Two presented a claim for "Negligent Petroleum Release and Negligent Abatement and Remediation of the Petroleum Release"; Count Three sought damages for "Common Law Trespass"; and Count Four claimed "Liability under the State Water Control Law." By order dated January 20, 1995, Judge

Bryan dismissed Counts Two through Four on the ground that damages stemming from fuel discharges that were in compliance with orders of the Environmental Protection Agency ("EPA"), such as those discharges occurring during Star's remediation efforts, are barred by the doctrine of preemption. Because Mr. Cavallo was only named as a plaintiff in Counts Three and Four, he is no longer a party to this action.

**7.** From a review of the complaint and her subsequent pleadings, it is apparent that Ms. Cavallo seeks damages for her chronic, ongoing illnesses and not for her initial pain and discomfort immediately following her exposure to the vapors from the spilled fuel.

organic compounds. To look beyond this basic adherence to form and inquire whether their *reasoning* is valid, Ms. Cavallo argues, is to usurp the role of the jury and exceed the proper bounds of judicial gatekeeping under *Daubert*. Star's second motion is a motion for summary judgment, and it appears to rely chiefly on the motion in limine. Thus, Star contends that if the motion in limine is granted, there would be insufficient evidence of causation to permit a jury to find in favor of Ms. Cavallo.

Oral argument on the motions was heard on June 16, 1995, following which the matters were taken under advisement. The Court thereafter reviewed the record, the parties' arguments, and the relevant case law, and on June 21, 1995, issued an Order granting the motion in limine for reasons to be set forth in a subsequent memorandum opinion. The motion for summary judgment remained under advisement, and is now ripe for disposition, as well. This Memorandum Opinion sets forth the reasons for granting the motion in limine and the summary judgment motion.

## II. Motion in Limine

■ The admissibility of expert testimony is expressly governed by Rule 702 of the Federal Rules of Evidence,[8] which provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

In discussing the requirements of Rule 702, the Supreme Court has emphasized that federal judges maintain a "gatekeeping responsibility" to ensure that admitted scientific testimony is both relevant and reliable. *Daubert*, —— U.S. at —— & n. 7, 113 S.Ct. at 2795 & n. 7. Because expert witnesses, unlike ordinary witnesses, may offer opinions

that are not based on first-hand knowledge or observation, Rule 702 sensibly imposes threshold standards for admitting such testimony. Thus, underlying the Rules' allowance of expert testimony is the fundamental "assumption that an expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*, —— U.S. at ——, 113 S.Ct. at 2796. Given this, and given the unique potential of expert evidence to "be both powerful and quite misleading," *id.*, —— U.S. at ——, 113 S.Ct. at 2798 (citation omitted), the reliability and relevance of expert testimony are preliminary matters for the courts' determination. *Id.*, —— U.S. at ——-——, 113 S.Ct. at 2794–98.

■ In performing this "gatekeeping" task, district judges are instructed to engage in a two-part analysis. *United States v. Dorsey*, 45 F.3d 809, 813 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2631, —— L.Ed.2d —— (1995); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1315 (9th Cir.1995) (*on remand from Daubert*, —— U.S. at ——, 113 S.Ct. at 2786) (hereinafter *"Daubert Remanded"*). First, district courts must determine whether the proffered expert testimony consists of "scientific knowledge", which is essentially a reliability inquiry. *Id.* Second, even if the "scientific knowledge" prong is satisfied, courts must inquire further to ascertain whether the proposed testimony is relevant, that is, whether it will "assist the trier of fact." *Id.* These two steps are addressed *seriatim.*

■ The Supreme Court has interpreted the "scientific knowledge" requirement of Rule 702 as "establish[ing] a standard of evidentiary reliability" or "trustworthiness", *Daubert*, —— U.S. at —— & n. 9, 113 S.Ct. at 2795 & n. 9, where "evidentiary reliability" means, in effect, "scientific validity". *Id.*, —— U.S. at —— n. 9, 113 S.Ct. at 2795 n. 9. And to be scientifically valid, an expert's opinion must be "ground[ed] in the methods and

---

**8.** As the Supreme Court made clear in *Daubert*, —— U.S. at ——, 113 S.Ct. at 2792–94, Rule 702 displaces the former *Frye* standard regarding expert testimony, a standard which focused exclusively upon whether the proffered expert opinion had gained "general acceptance" in the relevant scientific community. *Frye v. United States*, 293

F. 1013, 1014 (D.C.Cir.1923). Although "general acceptance" remains a relevant factor under Rule 702 in determining the admissibility of scientific expert testimony, it is but one of many relevant factors. *Daubert*, —— U.S. at ——, 113 S.Ct. at 2797.

procedures of science," *id.*, and "supported by appropriate validation." *Id.; Dorsey,* 45 F.3d at 813. Thus, conjecture, hypothesis, "subjective belief, or unsupported speculation" are impermissible bases for expert opinion and must be discarded. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795; *Anderson v. National R.R. Passenger Corp.,* 866 F.Supp. 937, 943 (E.D.Va.1994). In short, *Daubert* commands that in court, science must do the speaking, not merely the scientist.[9] *See Daubert Remanded,* 43 F.3d at 1315–16.

A variety of factors may affect the validity, or reliability, of a particular scientific expert opinion, but the *Daubert* Court noted four in particular. They are:

(1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used; and (4) the degree of the method's or conclusion's acceptance within the relevant scientific community.

*Dorsey,* 45 F.3d at 813 (citing *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2796–97). Testing is an important factor because it is at the heart of scientific methodology; if a particular theory or technique cannot be tested in an attempt to prove its truth or falsity, it bears less resemblance to science than to general philosophy. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2796–97. Testability is central to the scientific method. Similarly, while not dispositive, the peer review and publication inquiries are important for the simple reason that a theory or technique that has withstood the critical review of fellow scientists is apt to be more reliable than one that has remained sheltered from professional scrutiny. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2797 (stating that "submission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected"). The

rate of error of a particular method is relevant, of course, to its reliability, as is the degree to which a method or theory has been embraced by the scientific community. It bears emphasizing that no one factor controls, and the circumstances of each particular case must be carefully considered.

The second part of the admissibility analysis gives the courts a more familiar role to play. Described by the Supreme Court as "fit", this second prong focuses on the relevance of the proffered opinion to an issue in the case. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2795–96. As the *Daubert* Court aptly noted, "fit" is required because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." —— U.S. at ——, 113 S.Ct. at 2796. Accordingly, not only must the opinion be scientifically valid, or reliable, but it must also advance the trier of fact's understanding of a material issue in the case.

The distinction between "scientific validity" and "fit" is not always clear, and the two inquiries may overlap in a particular case. For instance, there may be times where an expert relies on published literature and widely accepted, tested theories in forming her opinion, and her ultimate conclusion is clearly relevant to an issue in the case. Yet, if those published theories and studies purport to prove XYZ, and from them, the expert concludes ABC, it may be that the expert's reasoning process itself is not scientifically valid. Put another way, there may be a lack of "fit" between the tested theories relied upon and the ultimate conclusion reached. An extreme example illustrates this point. A study regarding the mating habits of gypsy moths may be scientifically valid for certain purposes, and an expert's conclusion that a particular chemical caused a certain illness may be relevant in a given case. But if the expert purports to base her causation conclusion on the gypsy moth study, then the opinion can hardly be said to have met the requirements of Rule

---

**9.** Of course, scientists, like all human beings, hold certain opinions based on no more than intuition or belief. Because such opinions are not subject to rigorous scientific validation (through testing, peer review, and the like), they are mere hypotheses that fall short of the evidentiary requirements of Rule 702. Were such untested opinions and beliefs admissible, then, contrary to *Daubert,* scientists would be speaking in court without the benefit of science.

702. Although courts must not exclude expert testimony based on a valid methodology simply because they disagree with the ultimate conclusion reached, they have an obligation to ensure that the conclusion is reliable, that is, that there is a scientifically valid link between the sources or studies consulted and the conclusion reached. *Cf. Porter v. Whitehall Lab., Inc.*, 9 F.3d 607, 614 (7th Cir.1993) (stating that "[i]f experts cannot tie their assessment of data to known scientific conclusions, based on research or studies, then there is no comparison for the jury to evaluate and the expert's testimony is not helpful to the jury").

The Third Circuit addressed this problem in *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3d Cir.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). There, residents housed near a railcar maintenance facility that had used polychlorinated biphenyls (commonly referred to as PCBs) in its business activities for many years claimed that their continued exposure to the PCBs had caused a variety of illnesses. In reviewing the *Daubert* principles, the Third Circuit panel noted that the scientific knowledge requirement, which mandates that the expert's conclusions be based on "good grounds", applies to each step of the expert's analysis. *Paoli R.R.*, 35 F.3d at 745. Thus, the panel emphasized that "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.*" *Id.* (emphasis in original). Similarly, the *Paoli* panel remarked that "the expert's view that a particular conclusion 'fits' a particular case must itself constitute scientific knowledge—a challenge to 'fit' is very close to a challenge to the expert's ultimate conclusion about the particular case." *Id.* at 746. *Cf. Developments in the Law—Confronting the New Challenges of Scientific Evidence*, 108 Harv. L.Rev. 1481, 1536 (1995) (stating that where expert relies on studies involving animal exposure to particular chemical to prove similar effect in humans, "[c]ourts must assess the scientific validity of the hypothesis proffered to justify such an extrapolation").

This interrelationship between fit and scientific validity is illustrated by a case involving an alleged correlation between a pregnant woman's use of Retin–A, a Vitamin A derivative acne medication, and her child's birth defects. *Chikovsky v. Ortho Pharmaceutical Corp.*, 832 F.Supp. 341 (S.D.Fla. 1993). Although there were no published studies on the effects of Retin–A on fetal development, the plaintiff's expert in *Chikovsky* concluded that the Retin–A absorbed by the mother had caused the child's birth defects. He based this conclusion on studies showing a correlation between birth defects and high doses of Vitamin A and certain other Vitamin A derivatives. In holding that the expert's opinion was not scientifically valid, the court cited the expert's ignorance of the amounts of Retin–A absorbed by the plaintiff, noted the absence of any established dose-response relationship for Vitamin A and birth defects, and explicitly found that his "analogies to research concerning Vitamin A and other Vitamin A derivatives is [sic] wanting." *Id.* at 346.

Similarly, in *Schmaltz v. Norfolk & Western Ry. Co.*, 878 F.Supp. 1119 (N.D.Ill. 1995), the plaintiff claimed that his exposure to certain herbicides containing atrazine caused his chronic respiratory disease. Like the situation in *Chikovsky*, the plaintiff's expert could not cite any documented cases where exposure to these chemicals caused the alleged illness. Rather, he relied on studies where high doses of atrazine caused eye irritation in rabbits. In excluding the expert's testimony under *Daubert*, the court observed that the record

> fails to make clear why the incidence of eye irritation in rabbits exposed to high doses of atrazine could reasonably lead a doctor to conclude that an indirect exposure to atrazine could cause pulmonary or respiratory conditions in humans. 'The analytical gap between the evidence presented and the inferences to be drawn on the ultimate issue ... is too wide' in the present case.

*Schmaltz*, 878 F.Supp. at 1122 (quoting *Conde v. Velsicol Chem. Corp.*, 24 F.3d 809, 814 (6th Cir.1994)). Thus, it is apparent that a determination regarding the scientific va-

lidity of a particular theory requires not only an examination of the trustworthiness of the tested principles on which the expert opinion rests, but also an analysis of the reliability of an expert's *application* of the tested principals to the particular set of facts at issue.

These, then, are the principles that describe and control a district court's gatekeeping function, and they are therefore the principles that govern the assessment of the expert opinions at bar.

### A. Dr. Monroe

#### 1. The illness

Dr. Monroe is a toxicologist. In his report on Ms. Cavallo, Dr. Monroe concludes that she "is suffering a variety of irritant effects from exposure to petroleum hydrocarbon vapors from the Fairfax Terminal site." (Monroe Rpt. at 5). This conclusion is certainly vague, as it fails to identify the "irritant effects" from which Ms. Cavallo suffers. Nor does it distinguish between harms attributable to the December 1991 AvJet spill and harms caused by vapors released incident to Star's normal operations. These deficiencies are important, for as noted earlier and due to prior rulings in this case, Ms. Cavallo may only recover for specific injuries directly attributable to the AvJet spill. Yet, it is also important to note that this fact does not necessarily preclude recovery for symptoms related to her continued exposure to the petroleum hydrocarbons from the Star facility, provided the spill itself injured her in such a way as to render her more susceptible to such symptoms.

As it happens, however, Dr. Monroe's deposition testimony provides a more detailed description of his opinions in this case. From this testimony, it appears that the "irritant effects" to which Dr. Monroe referred in his written report include chronic burning sensations in the eyes, conjunctivitis, sinusitis, and throat irritation. It is also apparent that Dr. Monroe believes that Ms. Cavallo's exposure to AvJet fumes on the night of the spill has chronically "sensitized" her to petroleum hydrocarbons and various other chemicals. While she could tolerate exposure to low levels of these hydrocarbons before the spill, he opines, her inhalation of heightened concentrations of hydrocarbons on the night of the spill has now rendered her unable to tolerate those same low levels of daily exposure.[10] Dr. Monroe's opinion is plainly relevant to the issue of causation, and if scientifically valid, would be admissible to show that Ms. Cavallo's exposure to vapors from the AvJet spill caused her various ongoing illnesses.

#### 2. The methodology

Analysis properly focuses, therefore, on whether Dr. Monroe's opinion in this regard passes the scientific validity test of *Daubert.* And, as *Daubert* makes clear, the proper focus of this inquiry rests upon the validity of his chosen methodology. While Dr. Monroe is not explicit regarding the methodology he followed in this case,[11] Star contends that

---

10. Excerpts from Dr. Monroe's deposition testimony are instructive.

Q: Do you have any opinion as to which of these conditions Mrs. Cavallo suffers from?
A: My opinion is that her condition is the result of the irritant effects of emissions from the Avjet spill. And it is a chronic condition also involving continuing low level exposures to various compounds from that site. Oh, I should also note that she apparently was able to tolerate those low level exposures prior to her exposures at the time of the spill incident, and that is what indicates to me that she became more sensitive at that particular time.
(Monroe Tr., Vol I., at 42).
Q: Which of her symptoms were caused by her subsequent exposure to petroleum hydrocarbons since December of 1991?

A: I believe that the December of 1991 exposure initiated the disease processes in Mrs. Cavallo. I don't believe the subsequent exposures caused these illnesses, though her condition appears to improve and worsen according to ongoing exposures.
(Monroe Tr., Vol. II, at 7).
Q: So there's [sic] really two things that happened to her; she had this [sic] specific irritant effects that were directly caused in December of '91 as well as this increased sensitivity, is that correct?
A: I believe that is what her medical records indicate.
(Monroe Tr., Vol. II, at 36–37).

11. Although Dr. Monroe notes that various factors *support* his conclusion, he does not set forth what methodology is appropriate or valid for a toxicologist to follow in reaching such a conclu-

there are certain scientific principles and methods upon which a toxicologist must rely in forming an opinion regarding whether exposure to specific chemicals could cause certain maladies in individuals. Specifically, the methodology adopted by Star's toxicology expert, Dr. Joseph Rodricks, and endorsed by the World Health Organization, the National Academy of Sciences, and various agencies of the United States Government, calls for the following "risk assessment":

[ (1) ] First, an evaluation is made of the chemicals to which the individual might have been exposed, and of the concentrations of these chemicals in air breathed by the individual. [ (2) ] The second step involves an evaluation, based on the published scientific literature, of the exposures necessary to produce the adverse effects associated with the chemicals to which individuals may be exposed. [ (3) ] These two evaluations are then combined in the final step of the risk assessment to provide an estimate of the likelihood that any of the harmful properties of any or all of the chemicals might have been expressed in the exposed individual.

(Rodricks Rpt. at 3). As Dr. Rodricks explains, all chemicals can cause health problems at some level or concentration of exposure, but they vary widely in the types of harm caused and in the levels of exposure required to trigger those harms. In addition, all chemicals have thresholds of exposure that must be exceeded before the harms will occur, and these thresholds may be identified through scientific studies and literature. The task of the toxicologist, therefore, is to identify a dose-response relationship for a particular chemical (or chemical mixture) and illness and analyze the results to determine whether the duration and concentration of exposure in a given instance could have caused the alleged harms. (Rodricks Rpt. at 2–3).

Significantly, in her memorandum opposing the motion in limine, Ms. Cavallo acknowledges that the methodology described by Dr. Rodricks is the appropriate methodology for a toxicologist. Furthermore, she contends that Dr. Monroe followed that methodology in reaching his conclusion. It is this contention that must now be examined.

With respect to the first step in the analysis, Dr. Monroe concedes that he knows some, but not all, of the specific volatile components of the spilled AvJet fuel, such as naphthalene, xylene, hexane, nomane, decane, undacane, octane, and ethyl benzine. In addition, the parties agree for present purposes that the concentration of exposure was 61 mg/m$^3$, for a duration of 5–30 minutes.[12]

sion. As stated in his report, the factors supporting his conclusion are:

1) her general good health prior to the exposure.
2) close proximity in time between her exposure to volatile components of the aviation fuel spill and the initial onset of symptoms.
3) highly irritant nature of the volatile petrochemicals as indicated by symptomology [sic] of firemen and others at the spill site.
4) opinions of her treating physicians that the observed symptoms are the probable result of exposure to petroleum hydrocarbons.
5) worsening of symptoms when the petroleum vapors are present and improvement of symptoms when she is able to spend time away from the area.
6) consistency of Mrs. Cavallo's symptoms with the known health effects of exposure to volatile organic compounds as detailed in the published medical literature.

(Monroe Rpt. at 6).

12. Dr. Monroe was not aware of the concentration and duration of exposure in making his initial assessment. It is fairly clear from a review of the record that in many instances, Dr. Monroe did not follow the methodology to form his opinion, but rather formed his opinion and then tried to conform it to the methodology. The following dialogue is illustrative:

Q: And it's your opinion that [a concentration of 61 mg/m3] would be sufficient to cause sensitization in Mrs. Cavallo; is that correct?
A: That's correct.
Q: What concentration—First of all, let me ask you this. What was the duration of her exposure?
A: Well, I'm not sure exactly.
Q: Would that be important to know?
A: I've not found that to be essential for my assessment.

            *    *    *    *    *    *

Q: Why is that, sir?
A: Because the available information is sufficient to indicate that the exposure was of sufficient duration to cause an irritant effect on Mrs. Cavallo.

(Monroe Tr., Vol. I, at 50–51).

The second step in the methodology requires the toxicologist to consult the published literature to ascertain a dose-response relationship for the particular chemicals at issue. Dr. Monroe agreed in his deposition that "there should be a threshold below which irritant effects do not occur," and he conceded that he did not know the specific threshold for the chemicals to which Ms. Cavallo was exposed. (Monroe Tr., Vol II, at 37). Nonetheless, he stated that the literature and studies he reviewed provided ample support for his conclusion that Ms. Cavallo's one-time exposure to AvJet for a period of 5–30 minutes at a concentration of 61 mg/m³ caused her chronic conjunctivitis and her heightened chemical sensitivity.[13] With respect to the chronic conjunctivitis, the studies on which Dr. Monroe places primary reliance are the Molhave study,[14] the Koren study,[15] the Bascom case report,[16] and the Porter case report.[17]

In the Molhave study, a group of 62 individuals who were already sensitive to their indoor environments were exposed for less than three hours to a mixture of 22 volatile organic compounds ("VOCs"). The purpose of the study was to examine indoor air quality and what has come to be known as "sick building syndrome," and the individual VOCs used were known to be indoor air pollutants. The study showed that exposure to this combination of 22 VOCs for 2.75 hours at concentrations of 5 and 25 mg/m³ caused irritation in the exposed individuals' eyes, nose and throat. None of the exposed individuals suffered lasting effects.

In the Koren study, which again focused on problems associated with indoor air quality, the authors exposed 14 healthy individuals to almost the identical 22 VOCS used in the Molhave study. The study noted increases in nose and throat irritation after exposure to the mixture at a concentration of 25 mg/m³ for four hours. No lasting effects were observed.

Neither party submitted a copy of the Bascom article, so review here is limited to the synopsis provided by Dr. Monroe in his written report. According to Dr. Monroe, this paper

> reports a case of severe irritant conjunctivitis from exposure to VOCs emitted from new carpeting that was installed at the patient's place of work. Symptoms resolved during medical leave but recurred when she returned to work, and she eventually had to resign from her job.

(Monroe Rpt. at 4). Unlike the Molhave and Koren studies, the Bascom article is an anecdotal case report and does not reflect the results of a pre-designed study in a controlled setting.[18]

---

13. Notably, Dr. Monroe acknowledged that he could find no literature supporting the proposition that exposure to AvJet at a concentration of 61 mg/m³ for 5–30 minutes could cause Ms. Cavallo's sinusitis. The following exchange took place during his deposition:

> Q: In your opinion can an exposure, one-time exposure to 61 milligrams per cubic meter cause sinusitis?
> A: I believe it can cause respiratory irritation. I have not found any citations which support its causing sinusitis.
> Q: In your opinion can an exposure at 61 milligrams per cubic meter cause sinusitis?
> A: I believe that in the case of Mrs. Cavallo that that is correct.
> Q: I'm not sure I understand your answer, but let me ask the question again. Can an exposure, a one-time exposure to 61 milligrams per cubic meter cause sinusitis?
> A: Well, I haven't found sufficient data on which to estimate a threshold for that effect, so I do not know.
> Q: So you have no opinion, then, as to whether sinusitis can be caused by an exposure of

> 61 milligrams per cubic meter, is that correct?
>   * * * * * *
> A: That's right.
> (Monroe Tr., Vol. II, at 49–50).

14. Lars Molhave et al., *Human Reactions to Low Concentrations of Volatile Organic Compounds*, 12 Env't Int'l 167 (1986).

15. Hillel S. Koren et al., *Exposure of Humans to a Volatile Organic Mixtures III: Inflammatory Response*, 47 Archives Envtl. Health 39 (1992).

16. R. Bascom, *Differential Responsiveness to Irritant Mixtures: Possible Mechanisms*, 641 Ann. N.Y.Acad.Sci. 225 (1992).

17. Henry O. Porter, *Aviators Intoxicated by Inhalation of JP–5 Fuel Vapors*, 1990 Aviation, Space, & Envtl. Med. 654 (1990).

18. The findings of anecdotal case reports are generally afforded less weight than the conclusions of designed and controlled studies. *See*

Finally, the Porter article, also anecdotal, reports on the physical symptoms of two Navy aviators following an incident where their cockpit accidentally became "overwhelmed" with JP–5 fuel vapors.[19] The aviators had detected fuel vapors throughout the one-hour flight, but the fumes suddenly became "excessive," and an emergency landing was required. Both pilots experienced burning sensations in their eyes, and one developed a headache and nausea. One pilot recovered completely within 24 hours, and the other had fully recovered and returned to flight duty within four days. The author concluded that exposure to the JP–5 fuel can cause a short-term intoxicating effect in humans.[20]

■ The scientific basis for Dr. Monroe's reliance on these studies is far from clear. In explaining why he believes the results of the Molhave study are transferrable to the effects of kerosene or AvJet, Dr. Monroe stated at one point in his deposition testimony that it was due to "similarities in the components in the mixture used by Molhave and components in the volatile fractions of kerosene and avjet [sic]." (Monroe Tr., Vol. II, at 45). Yet, he identified only seven of the 22 VOCs present in the Molhave study as being present also in AvJet. In addition, he conceded that no one individual chemical in AvJet was likely to have caused Ms. Cavallo's adverse reaction; rather, he stated, "it's the combination of the components [of AvJet] that caused it." (Monroe Tr., Vol. I, at 84). The authors of the Koren study made a similar observation regarding the Molhave study:

Casey v. Ohio Medical Prods., 877 F.Supp. 1380, 1385 (N.D.Cal.1995) (stating that "case reports are not reliable scientific evidence of causation, because they simply describe[ ] reported phenomena without comparison to the rate at which the phenomena occur in the general population or in a defined control group; do not isolate and exclude potentially alternative causes; and do not investigate or explain the mechanism of causation").

19. The author explains that "[m]ilitary JP–5 fuel is composed of straight chain hydrocarbons between C10 and C15. It is a high flash-point kerosene-type aviation fuel mixture" with various additives. He also notes that "[t]here is little

Because no single chemical would be expected to cause a reaction, Molhave hypothesized that *the sum of all the VOCs present in the mixture*, rather than any single constituent chemical, may be the cause of the effects observed in his study.

Koren, *supra* note 15, at 41 (emphasis added). Thus, both the authors of the studies and Dr. Monroe himself caution against extrapolating the findings regarding the effects of one mixture in assessing the effects of a substantially different mixture. Furthermore, Dr. Monroe admits that the dose-response relationships observed in the Molhave and Koren studies would be dependent upon the combination of chemicals used, and yet he concedes he does not know how the numbers would be affected by changing the chemical components used in the studies to resemble those of AvJet or kerosene. (Monroe Tr., Vol. I, at 90–92, Vol. II, at 46). Finally, even if the chemicals used in the Molhave and Koren studies were identical to AvJet, Dr. Monroe does not explain why the short-term effects noted there are consistent with the long-term effects claimed here. While Rule 702 does not necessarily mandate that the expert find a study linking the *exact* chemicals at the *exact* exposure levels with the *exact* illnesses at issue, it does require that the expert demonstrate a scientifically valid basis for projecting the findings of a study identifying a different chemical-illness relationship to the proffered causal theory. Nowhere does Dr. Monroe explain why the dose-response figures found in these studies and the ailments observed there can reliably be transferred to the case at bar.

information on JP–5 toxicity in humans." Porter, *supra* note 17, at 655.

20. Porter also notes that "[s]everal cases of purposeful inhalation, intoxication, and addiction to gasoline vapors have been reported.... Symptoms associated with cerebral intoxication caused by intentional inhalation of gasoline vapors include: confusion, lack of self-control, excitement, combativeness, blurred vision, incoordination, depression, lethargy, headaches, roaring in the ears, trembling, nausea, burning in the chest, constriction in the throat, and staggering gait. Severe exposure results in dyspnea, cyanosis, delirium, coma, seizures, and death." Porter, *supra* note 17, at 655.

The Bascom report appears even less germane, as the particular carpet fiber VOCs are not identified, and, as is common with anecdotal case reports, no dose-response relationship was established. Nor is Dr. Monroe's reliance on the Porter case report explained in any organized or coherent way. Although the chemicals found in JP–5 fuel presumably bear a closer resemblance to AvJet than does the VOC mixture of indoor air pollutants contained in the Molhave and Koren studies, Dr. Monroe acknowledges that he does not specifically know the differences between AvJet and JP–5.[21] Nor is there any way of knowing the concentration of vapors to which the aviators were exposed when their cockpit became "overwhelmed" with the fuel fumes.[22] In addition, even at this apparently high concentration level, the reported physical effects were of brief duration. While the Porter study supports the conclusion that at some level, fuels (as all chemicals) can have some adverse health effects, it does little to satisfy the second step in the methodology: consulting the published scientific literature to identify the exposure level and duration necessary to produce the given injuries.[23]

Dr. Monroe's conclusion that the AvJet spill caused Ms. Cavallo to become "sensitized" to petroleum hydrocarbons and various other chemicals finds even less direct support in the literature. Because none of the previously referenced studies reports any long-term effects from the various toxic exposures, Dr. Monroe relies upon a different group of studies to support his "increased sensitivity" diagnosis. Specifically, he relies heavily on studies regarding the relatively recent and apparently quite controversial syndrome of Multiple Chemical Sensitivity ("MCS"), as well as on studies concerning Reactive Upper Airways Disease ("RUDS") and Reactive Airways Dysfunction Syndrome ("RADS").[24] Although Dr. Monroe has not definitively categorized Ms. Cavallo's "sensitivity" illness as one of these syndromes, he seems to suggest that she may be suffering from at least one of them.[25]

Ms. Cavallo does not attach copies of these studies to her legal memoranda, but Dr. Monroe provides summaries of studies involving RUDS and MCS in his report. From these, it appears that RUDS is a "persistent chronic rhinitis condition" that may result from unidentified "chemical exposure". (Monroe Rpt. at 3). According to Dr. Monroe, the "chief complaint of patients with

---

**21.** Porter indicates that JP–5 fuel contains numerous additives, including "antioxidants, metal deactivators, corrosion inhibitors, fuel system icing inhibitors, and an electrical conductivity additive," all of which "individually or in combination, could have toxic effects on the brain." Porter, *supra* note 17, at 2. By contrast, Dr. Monroe does not know whether AvJet contains any such additives. (Monroe Tr., Vol. I, at 91).

**22.** While an exact concentration is unknown, the relatively small size of a cockpit and the fact that the aviators were "overwhelmed" by fumes suggests that the concentration of vapors to which the aviators were exposed was significantly greater than the level alleged here.

**23.** As noted earlier, the fact that the Bascom and Porter articles are anecdotal case reports renders their findings less reliable in establishing causation. *See supra* note 18. The authors of the Koren study apparently agree. Noting the scarcity of controlled research on the effects of various VOCs, they stressed that it is "important to perform studies in which human volunteers are exposed to known amounts of specific pollutants in a controlled setting." Koren, *supra* note 15, at 40.

**24.** *See* William J. Meggs, *Neurogenic Inflammation and Sensitivity to Environmental Chemicals*, 101 Envtl. Health Perspective 234 (1993); William J. Meggs, *RADS and RUDS—the Toxic Induction of Asthma and Rhinitis*, 32 Clinical Toxicology 487 (1994); William J. Meggs, et al., *Rhinolaryngoscopic Examination of Patients with the Multiple Chemical Sensitivity Syndrome*, 48 Arch. Envtl. Health 14 (1993); J.E. Cone, et al., *Patients with Multiple Chemical Sensitivities: Clinical Diagnostic Subsets among an Occupational Health Clinic Population*, 2 Occup. Med. State of the Art Reviews 721 (1987).

**25.** Dr. Monroe's testimony is somewhat unclear with respect to whether he believes Ms. Cavallo suffers from one of these syndromes. At one point, when asked whether Ms. Cavallo suffers from a condition known as Solvent Intolerance, RUDS, RADS, or MCS, Dr. Monroe responded "[w]ell, as expressed in my report, my opinion is that she's suffering from the irritant effects of petroleum hydrocarbons. I really have not attempted to classify her condition beyond that." (Monroe Tr., Vol. II, at 15). Yet, at other times, he opined that her condition was consistent with RUDS, MCS, and to a lesser degree, Solvent Intolerance. (Monroe Tr., Vol. II, at 12–13).

RUDS is chemical sensitivity," and he notes that in one study, 100% of the patients with RUDS also had MCS. (Monroe Rpt. at 3). In describing a study of 10 patients with MCS, Dr. Monroe notes that "[a]ll the patients had an initial chemical exposure, which was followed by multiple physical and mental complaints in response to subsequent exposure to a variety of odorous organic chemicals." (Monroe Rpt., at 4). Both RUDS and MCS appear to be general terms describing individual's sensitization to any number or type of chemicals. None of the studies dealt with the effects of exposure to AvJet, nor did they identify dose-response relationships for any of the chemicals involved. Thus, the missing link between the studies on MCS and RUDS and Dr. Monroe's conclusion regarding Ms. Cavallo's heightened sensitivity to petroleum hydrocarbons is a scientifically valid basis for the conclusion that *AvJet* (as opposed to chemicals generally) can cause these syndromes at an exposure of no more than 61 mg/m$^3$ for a duration of no more than 30 minutes.

In this respect, these studies do little to further Dr. Monroe's opinion, other than to support the view that there *is* such an illness as chemical sensitivity that can be caused by exposure to some chemicals. But even that view is controversial. *See, e.g., Bradley v. Brown,* 852 F.Supp. 690, 699 (N.D.Ind.) (quoting Dr. Meggs, author of most of the studies upon which Dr. Monroe relies, as acknowledging that the etiology of MCS "is as controversial as the syndrome itself" and that his etiological model is "speculative"), *aff'd* 42 F.3d 434 (7th Cir.1994); *Graham v. Canadian Nat'l Ry. Co.,* 749 F.Supp. 1300, 1310–11 (D.Vt.1990) (describing MCS as "not clearly defined" and the "subject of disagreement in the medical community"); *see also* (Rodricks Rpt., at 13 (stating that "[t]he majority of individuals in the medical and scientific communities have great skepticism as to whether MCS is a verifiable syndrome and whether it is caused by chemical exposure")); (Witorsch [26] Rpt., at 16–17 (noting

"considerable doubt in the scientific medical community regarding the legitimacy of MCS as a valid nosologic/diagnostic entity")). Apparently cognizant of this weakness, Ms. Cavallo protests that Dr. Monroe does *not* conclude that she suffers from MCS. She writes:

The defendants attempt to mischaracterize the opinions of both Dr. Bellanti and Dr. Monroe as being based some how upon *the controversial theory of 'Chemical Sensitivity'.* Dr. Bellanti uses the term in an immunological sense and Dr. Monroe in an irritant sense. Dr. Monroe additional [sic] states in his deposition that he made no attempt to classify Ardith Cavallo's injuries as being attributable to chemical sensitivity.

(Mem. in Opp. of Mot. for Sum. Jud., at 13 n. 36) (emphasis added). Nor did Dr. Monroe categorize her condition as RUDS. But while this disclaimer effectively avoids the pitfalls of having to rely upon the questionable scientific validity of MCS and RUDS, it also undermines Dr. Monroe's reliance on the studies for his asserted purpose. If Dr. Monroe's conclusion that Ms. Cavallo has been "sensitized" in an "irritant sense" is different from a conclusion that she suffers from MCS or RUDS, then it is hard to see how the MCS and RUDS studies support his causation conclusion. The incongruence of Ms. Cavallo's argument is readily apparent, and her position is self-defeating. Without a better explanation, or indeed, an explanation at all, of what Ms. Cavallo's "increased sensitivity" illness is, how it is caused, and why MCS and RUDS literature supports it, Ms. Cavallo's position is untenable.

The reliability of Dr. Monroe's opinion that the AvJet spill caused Ms. Cavallo's chronic condition is further undermined by the fact that the information that *has* been gathered specifically on AvJet suggests that no ill effects would be expected from exposure to AvJet for the duration and at the concentration alleged in this case.[27] As described by

---

26. Dr. Philip Witorsch is a pharmacologist and toxicologist. He was retained by Star as an expert in this case.

27. At several points in her memoranda, Ms. Cavallo resorts to evidence that AvJet is toxic, and that Star knew it to be so, in an effort to support her experts' opinions of causation. (Mem. in Opp. to Defs' Mot. in Lim., at 3–4 (citing EPA

Dr. Rodricks in his report, Threshold Limit Values ("TLVs") have been established by the American Conference of Governmental Industrial Hygienists for petroleum compounds related to aviation fuel. These TLVs are based upon "the best available information from" human and animal studies as well as industrial experience, and "represent airborne concentrations of substances to which nearly all workers may be repeatedly exposed day after day without adverse health effects." (Rodricks Rpt., at 7–8). According to Dr. Rodricks' unrefuted assessment, the TLVs for aviation fuel, "which are designed to protect workers exposed 8 hours [per] day on a chronic basis," exceed the worst-case concentration to which Ms. Cavallo may have been exposed (61 mg/m$^3$) on one evening by a factor of more than 10. (Rodricks Rpt., at 8). Furthermore, Dr. Rodricks explained that he consulted the toxicology literature to determine the "no observed effect levels" ("NOELs") and "lowest observed effect levels" ("LOELs") in humans for acute exposure to jet fuels, kerosene, diesel, and gasoline. This consultation revealed that "[t]he worst-case air concentration for Mrs. Cavallo's exposure modeled by plaintiff's expert (61 mg/m$^3$ = 9ppm) was at least 15 times lower than the NOELs and LOELs observed in humans." (Rodricks Rpt., at 9).[28] While Ms. Cavallo contends that these NOELs, LOELs, and TLVs are heavily biased toward industry, a proposition that may well be true, she has not produced any alternative study, literature, or source that supports her conclusion that exposure to 61 mg/m$^3$ of AvJet for a relatively short duration could produce the chronic illnesses from which she allegedly suffers. *Cf. Conde,* 24 F.3d at 814 (stating that while the plaintiffs "cite published critiques of [the defendants'] studies, the critiques only underscore the need for further studies, and do not . . . establish causation").

### 3. Summary

In sum, Dr. Monroe's theory that Ms. Cavallo's exposure for 5–30 minutes to a 61 mg/m$^3$ concentration of AvJet caused her chronic conjunctivitis and sinusitis, or her "increased sensitivity" to petroleum hydrocarbons, lacks many of the indicia of reliability listed in *Daubert.* Chiefly, there is no support for this causation theory in the scientific literature. And to the extent that it has been tested (through establishment of TLVs, NOELs, and LOELs), the theory fails. Similarly, there is no evidence that Dr. Monroe's causation theory is supported in the scientific community. Because of this deviation from the scientific method, which the Fourth Circuit has defined as "subjecting testable hypotheses to the crucible of experiment in an effort to disprove them," Dr. Monroe's opinion cannot be deemed "scientific knowledge." *United States v. Bynum,* 3 F.3d 769, 773 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1105, 127 L.Ed.2d 416 (1994).

Although Dr. Monroe found support in the literature for a conclusion that exposure to similar levels of a different mixture of volatile organic compounds produce somewhat similar, short-term, effects, or that exposure to higher levels of a similar substance produce different, short-term effects, he is unable to provide any scientifically valid basis to support the leap from those studies to his opinion in this case. Similarly, the only literature arguably supporting such an illness as chronic chemical sensitivity is of questionable scientific validity and, more importantly, does not establish the link between *AvJet* and these illnesses. Thus, while the agreed-upon methodology appears to be scientifically valid, it does not appear to have been faithfully applied. *See Paoli R.R.,* 35 F.3d at 745 (noting that "*any* step that renders the analysis unreliable under the *Daubert factors renders the expert's testimony inadmissible. This is true whether the step completely*

---

Order)); (Supp. Mem. in Opp. of Mot. for Sum. Jud., at 3–5 (citing Texaco Material Safety Data Sheet)). Yet, as noted earlier and as readily conceded by Star, there is no doubt that AvJet, as all chemicals, can be toxic. As Paracelsus taught long ago, toxicity is a function of dose. Thus, the question for causation purposes is: At what levels of exposure do what kinds of harm occur?

**28.** He went on to note that "the worst-case air concentration modeled by Star's experts was at least 15,000 times lower than the NOELs and LOELs observed in humans." (Rodricks Rpt., at 9).

*changes a reliable methodology or merely misapplies that methodology*") (emphasis in original). In other words, like the circumstances in *Chikovsky* and *Schmaltz*, there is a lack of "fit" between the studies relied upon and the conclusion reached. *Chikovsky*, 832 F.Supp. at 346; *Schmaltz*, 878 F.Supp. at 1122. *See also Bradley*, 852 F.Supp. at 698 ("scientific expert opinion testimony is allowed on the rationale that the expert can tie the facts of a particular case to tested scientific theory"); *Casey v. Ohio Med. Prods*, 877 F.Supp. 1380, 1385 (N.D.Cal.1995) (study showing causal link between halothane and cirrhosis of the liver not scientific evidence of causal link between halothane and chronic active hepatitis). As a result, Dr. Monroe's opinion is not "scientific knowledge" and must be excluded.

## B. Dr. Bellanti

■ Dr. Bellanti is an immunologist. In his written report, he concludes that "Mrs. Cavallo suffers from chronic sphenoid sinusitis and pulmonary dysfunction as a direct and proximate cause of her exposure to aviation jet fuel in December, 1991." (Bellanti Rpt., at 4). He further concludes that the spill "traumatized" and "sensitized" her "to various volatile organic compounds including petroleum vapors and some household chemicals." (Bellanti Rpt., at 4).[29] Thus, like Dr. Monroe, Dr. Bellanti opines that the AvJet spill caused Ms. Cavallo's chronic conditions.

There is no question that Dr. Bellanti is qualified to testify regarding the nature of Ms. Cavallo's illnesses: namely, that she suffers from chronic sphenoid sinusitis and pulmonary dysfunction. Rather, the focus of the dispute is whether his opinion regarding the *cause* of these illnesses is scientifically valid and therefore admissible under *Daubert*. As with Dr. Monroe, resolution of this question necessarily requires an analysis of the reliability of the methodology employed by Dr. Bellanti, as well as careful scrutiny of his adherence to, and application of, that methodology.

Although neither party clearly explains the methodology applied by Dr. Bellanti,[30] it ap-

---

**29.** These conclusions, which attribute Ms. Cavallo's injuries to the December 1991 spill, appear to differ somewhat from Dr. Bellanti's initial deposition testimony. During his first of three depositions, Dr. Bellanti resisted attributing the cause of Ms. Cavallo's ongoing illnesses to one massive event rather than to an overall continuum of exposure. For instance, with respect to whether the spill caused any long-term effects in Ms. Cavallo, the following testimony occurred:

    Q: Do you have any opinion, Dr. Bellanti, on whether Mrs. Cavallo sustained any long-term damage or injury as a result of the separate, discrete, alleged exposure to petroleum products in December 1991?

    A: The basis of my opinion was made on the bases of the single exposure *and the continuing exposure*. I do not know. I do not have any opinion or I didn't make any opinions on the basis of long-term damage as a result of a single exposure.

(Bellanti Tr., at 21–22) (emphasis added).

    Q: Now, as an expert witness in this case, can you render an opinion on the question whether Mrs. Cavallo sustained any lasting damage or injury as a result of the one alleged event of exposure in December 1991?

    A: Without knowing the details of intensity of exposure, of duration of exposure, of the time of exposure, concentration, I don't— you know, *it would be idle speculation* for me to try to answer that question.

(Bellanti Tr., at 43–44) (emphasis added). Although it is possible that these responses could be considered consistent with his opinion that she was "sensitized" (as this implies newfound sensitivity to continued exposures rather than chronic illnesses apart from the continued exposures), Dr. Bellanti's initial responses to question regarding "sensitivity" are also puzzling:

    Q: Do you have any opinion of whether Mrs. Cavallo was sensitized to petroleum products or any other substances as a result of exposure in December 1991?

    A: I have no evidence for that.

(Bellanti Tr., at 58).

    Q: Is it fair to say that you have not in either your treatment of Mrs. Cavallo or your review of her medical records seen any evidence that she was sensitized as a result of exposure to petroleum products?

    A: I have never—that's never come into my thinking. I have no evidence of that.

(Bellanti Tr., at 61). Nevertheless, the Court accepts the conclusions contained in Dr. Bellanti's report for purposes of these proceedings and will presume either that Dr. Bellanti has modified his opinion since this deposition or that he interpreted the above questions as using the word "sensitized" in a different manner than intended in his report.

**30.** In its motion in limine, Star notes that Dr. Bellanti "did not even attempt to follow the procedures of toxicology" in forming his opinion. (Mem. in Sup. of Defs' Mot. in Lim., at 13). In her short response concerning Dr. Bellanti, Ms.

pears from a review of his written report as well as his deposition testimony that he primarily applied a methodology of differential diagnosis.[31] Thus, he determined from a review of Ms. Cavallo's medical history, from her description of the spill incident, from his initial examination of her, and from the timing of the spill in relation to her development of symptoms, that her exposure to the petroleum hydrocarbons could have caused her chronic illnesses. Dr. Bellanti then examined other possible causes of her symptoms (such as her history of smoking 1.5 packs a day for at least 20 and as much as 40 years,[32] possible allergies, possible MSG in the Chinese food eaten on the night of the spill, and Ms. Cavallo's exposure to a previous spill in 1960), and ruled out each one.[33]

The process of differential diagnosis is undoubtedly important to the question of "specific causation".[34] If other possible causes of an injury cannot be ruled out, or at least the probability of their contribution to causation minimized, then the "more likely than not" threshold for proving causation may not be met. But, it is also important to recognize that a fundamental assumption underlying this method is that the final, suspected "cause" remaining after this process of elimi-

nation must actually be *capable* of causing the injury. That is, the expert must "rule in" the suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from a scientifically valid methodology.

The methodology followed by toxicologists in determining whether a particular chemical could have caused a given injury has been previously discussed in reference to Dr. Monroe. *See supra* § II.A.2. Although Dr. Bellanti is not himself a toxicologist, he must nonetheless apply the principles and methods of toxicology if he is to give an opinion on an issue relating to that specialty. *Cf. Wade–Greaux v. Whitehall Lab., Inc.*, 874 F.Supp. 1441, 1478 (D.V.I.) (stating that "[a]lthough plaintiff's expert witnesses purport to hail from different disciplines, such as toxicology, pharmacology and pediatric pathology, each is offering an opinion with respect to human birth defects and their causes—*i.e.*, the field of teratology" and therefore "the methodologies they employ must be compared with the methodology generally accepted by the community of teratologists"), *aff'd* 46 F.3d 1120 (3d Cir.1994). And despite Ms. Cavallo's

---

Cavallo does not clearly identify the methodology he used, stating only in quite a conclusory fashion that:

[h]is independence, impartiality and lack of bias as an expert in his field is [sic] unchallenged. He has examined her innumerable times and conducted a vast number of diagnostic tests and procedures to rule out other causes of Mrs. Cavallo's medical condition. Dr. Bellanti did evaluate and consider the chemicals or concentrations of vapors to which plaintiff was allegedly exposed; he did assess the likelihood that exposure to AvJet vapors at the level plaintiff alleges could cause the specific illnesses she alleges; and he cited scientific literature to support his opinion that exposure to Av–Jet [sic] vapors could have caused illnesses of the sort plaintiff alleges (See Bellanti Exhibits 31–34).

(Mem. in Opp. to Defs' Mot. in Lim., at 11). This passage appears to reflect that Ms. Cavallo contends that Dr. Bellanti applied both 1) the toxicology methodology previously discussed to determine whether the AvJet spill could have caused her injuries and 2) a differential diagnosis to rule out other possible causes.

**31.** Differential diagnosis describes "a process whereby medical doctors experienced in diagnos-

tic techniques provide testimony countering other possible causes ... of the injuries at issue." *Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 270 n. 6 (3d Cir.1991).

**32.** The number of years that Ms. Cavallo smoked is variously reported in the record as 20 and 40.

**33.** Unlike Dr. Bellanti, Dr. Witorsch, one of Star's medical experts, concludes that Ms. Cavallo's chronic obstructive pulmonary disease is "entirely consistent" with her history of cigarette smoking. He also believes her sinusitis is consistent with common environmental allergens in the Washington, D.C. metropolitan area, with her history of cigarette smoking, and with congenital or developmental abnormalities involving her nose or paranasal sinuses. (Witorsch Rpt., at 15).

**34.** "General causation" refers to whether X *can* cause Y. Here, the issue of general causation is whether exposure to AvJet vapors at the asserted concentration and duration could have caused the alleged injuries. On the other hand, "specific causation" refers to whether X *did* cause Y in a given case. See *Casey*, 877 F.Supp. at 1383. It is in determining specific causation that differential diagnosis is helpful.

suggestions to the contrary, *see supra* note 30, Dr. Bellanti did not do so.

With respect to the level of Ms. Cavallo's exposure, Dr. Bellanti concluded only that she sustained a "massive exposure". (Bellanti Tr., at 231). He candidly acknowledged that in forming his opinion, he was unaware of the duration and intensity of exposure.[35] In addition, he repeatedly qualified his responses to deposition questions regarding levels of exposure and dose-response relationships with the reminder that he was not a toxicologist.[36]

Even assuming that he was aware of and considered the alleged 61 mg/m$^3$ level of exposure, Dr. Bellanti could cite no studies or published literature to support adverse effects from that level of exposure to AvJet. Although Dr. Bellanti cited no literature at all in his report, he referenced in his deposition testimony an article in which 286 asthmatic women were clinically evaluated.[37] While only 15.5% of those who improved clinically had come into contact with kerosene, 43.9% of those who did not improve used kerosene as a cooking fuel. For 16 of the women, their asthma developed soon after they began using kerosene.[38] The authors concluded that exposure to kerosene can cause asthma. While this article involves kerosene, which is substantially similar to AvJet, Dr. Bellanti acknowledged that it provided no information regarding the levels of kerosene to which these women were exposed. Nor does it lend support for the notion that one brief encounter with a given level of kerosene, rather than repeated exposures over a lengthy period, can produce the sort of chronic illnesses from which Ms. Cavallo suffers.

Prior to his third deposition, Dr. Bellanti reviewed various literature pertaining to the disease RADS.[39] He then cited these studies in his deposition testimony for the general proposition that "a single [chemical] insult can cause damage which can be permanent and long lasting." (Bellanti Tr., at 328). Yet significantly, Dr. Bellanti was only willing to say that Ms. Cavallo "could" have RADS, a facially speculative diagnosis. (Bellanti Tr., at 331–30). Furthermore, even if Dr. Bellanti had definitively diagnosed RADS, none of the studies cited dealt with the effects of AvJet or kerosene, nor did they establish

---

**35.** Like Dr. Monroe, *see supra* note 12, Dr. Bellanti's reasoning process with respect to causation at times appeared somewhat circular. Having indicated that he did not know the details of duration and intensity of exposure, he nonetheless concluded:

> I know that *she was exposed for a sufficiently long time*, and I do know from the Texaco report and from information that has been provided to me that there was a spill and that there was significant amounts of hydrocarbon in the atmosphere. Now, whether or not that was documented or not, that's—we could look at that later, I suppose, but that [sic] *there was sufficient exposure to cause her to develop symptomatology*.

(Bellanti Tr., at 44) (emphasis added).

**36.** For instance, the following question and answer are reported:

> Q: Assume, please, that one were exposed to vapors from jet fuel or filtered kerosene for 15 minutes or less, what concentration or intensity of vapors would be necessary in those circumstances to cause lasting respiratory injury?
> [objection omitted]
> A: Again, this is a question that is best posed to a toxicologist. This is beyond my level of expertise. I cannot answer that question.

(Bellanti Tr., at 54).

**37.** Rodriguez de la Vega et al., *Kerosene-induced Asthma*, 64 Annals of Allergy 362 (1990).

**38.** Because neither party submitted a copy of this article, and Dr. Bellanti did not describe the article in his report, these figures are taken from the summary of the article provided in Dr. Monroe's written report. While Dr. Monroe cited this article in his long list of references, he did not include it in his deposition testimony among the articles upon which he chiefly relied in forming his opinion.

**39.** The cited studies are:

1. Olav Axelson & Christer Hogstedt, *The Health Effects of Solvents, in* Occupational Medicine 764 (3d ed. 1994).

2. Stuart M. Brooks et al., *Reactive Airways Dysfunction Syndrome (RADS): Persistent Asthma Syndrome after High Level Irritant Exposures*, 88 CHEST 376 (1985).

3. David G. Kern, *Outbreak of the Reactive Airways Dysfunction Syndrome after a Spill of Glacial Acetic Acid*, 144 Amer. Rev. Resp. Diseases 1058 (1991).

4. Denyse Gautrin et al., *Is Reactive Airways Dysfunction Syndrome a Variant of Occupational Asthma?*, 93 J. Allergy & Clinical Immunology 12 (1994).

dose-response relationships for the chemicals that were involved.[40] Only the Kern article attempted to quantify the level of exposure to a chemical necessary to develop RADS, and that article involved exposure to glacial acetic acid. Even Dr. Bellanti admitted that the figures in this study "may not be completely extrapolable [sic]" to the case at bar. (Bellanti Tr., at 333).

Thus, it is clear that Dr. Bellanti did not follow the accepted toxicology methodology in formulating his opinion of causation in this case. At bottom, his opinion is founded primarily on the temporal connection between the spill and the development of Ms. Cavallo's symptoms,[41] as well as on his subjective, unverified, belief that AvJet can cause the types of injuries from which Ms. Cavallo suffers. This is not the method of science. See Schmaltz, 878 F.Supp. at 1122 (stating that "[i]t is well settled that a causation opinion based solely on a temporal relationship is not derived from the scientific method and is therefore insufficient to satisfy the requirements of [Rule] 702"). Because, like Dr. Monroe, Dr. Bellanti significantly departed from the appropriate methodology, his opinion is not based on the scientific method and is inadmissible under Rule 702.

## C. Summary

In sum, neither Dr. Monroe nor Dr. Bellanti sufficiently adhered to the established toxicology methodology in forming their conclusions that Ms. Cavallo's exposure to AvJet vapors from the December 1991 spill caused her various chronic illnesses. Their testimony, therefore is not "supported by appropriate validation" as required by Daubert, —— U.S. at ——, 113 S.Ct. at 2795, and is ultimately unreliable. In the final analysis, the opinions of Drs. Monroe and Bellanti are based largely on hypothesis and speculation. This is not to say that the doctors are insincere in their opinions, or that their opinions may not some day be validated through scientific research and experiment.[42] It may well be that the AvJet spill forever "sensitized" Ms. Cavallo to petroleum vapors and various other household chemicals. But the published scientific literature and test results simply do not support that conclusion at this time.[43] And the price paid for this seemingly stringent standard of reliability is that, unavoidably, some legitimate injuries will be left unredressed. See Daubert, —— U.S. at ——–——, 113 S.Ct. at 2798–99 (recognizing that "in practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations").

Also worth emphasizing is that the circumstances of each case are unique, and the absence of scientific validation through published studies and tested hypotheses is not always fatal to an expert's opinion. Specifi-

---

**40.** At oral argument, the attorneys for Ms. Cavallo cited the Hudnell study, which does not deal with RADS, as providing dose-response figures that support Dr. Bellanti's opinion. H. Kenneth Hudnell et al., Exposure of Humans to Volatile Organic Mixture II: Sensory, 47 Archives Envtl. Health 31 (1992). This study involved virtually the identical combination of 22 VOCs used in the Molhave and Koren studies, see supra notes 14–15, and, like the others, was designed to analyze sick building syndrome. Sixty-six healthy males were exposed to a concentration of 25 mg/m³ of the 22 VOC mixture for 2.75 hour periods, during which increases in eye and throat irritation, headache, and drowsiness were observed. Like the other studies, no long-term effects were reported. Just as Dr. Monroe failed to demonstrate any scientifically valid basis for transferring the Molhave and Koren data to Ms. Cavallo's exposure to AvJet, supra, Dr. Bellanti has not provided a sufficient explanation for his purported reliance on the Hudnell study.

**41.** Dr. Bellanti essentially admits that the temporal relationship between the exposure and her symptoms is a principal factor underlying his opinion. (Bellanti Tr., at 76) (stating that "I think the fact that the history suggests that things took a turn for the worse after '91 is one of the major aspects in my assessment that there was a causal relationship to the exposure and her present condition").

**42.** Nor are the general qualifications of Dr. Monroe and Dr. Bellanti questioned here. Both men possess impressive credentials and have substantial experience in their respective fields.

**43.** This is often true in "the growing field of hazardous-substance litigation, where the causal relationship between exposure to a hazardous substance and subsequent symptoms may be hypothesized, but not yet tested and proven to the legally required degree of certitude." Bradley, 852 F.Supp. at 696 (citing Daubert, —— U.S. at ——–——, 113 S.Ct. at 2796–99).

cally, there may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology. Thus, if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened. Similarly, statistical evidence can be persuasive in certain contexts. For instance, if a known chemical is accidentally introduced into a company's ventilation system, and all of the workers exposed immediately develop the same adverse reaction, then the episode itself may be sufficiently indicative of causation. This, however, is not such a case,[44] and the failure to adhere to the applicable methodology renders inadmissible the expert opinions proffered here.

### III. Summary Judgment Motion

It follows from the exclusion of the expert testimony of Drs. Monroe and Bellanti that summary judgment must be granted in favor of Star. Even assuming Star's negligence in permitting the AvJet spill, and even assuming that Ms. Cavallo suffers from the chronic illnesses she alleges, there is insufficient evidence of causation to create a triable issue of fact for the jury.

■■■ In general, expert testimony is required to prove that exposure to a toxic substance caused a certain injury or illness.[45] Without reliable expert testimony linking Ms.

Cavallo's exposure to AvJet fumes from the spill to her subsequent development of chronic respiratory problems, the jury could only speculate, based on a loose temporal relationship and not scientific fact, that a causal relationship exists. Such an inference would be impermissible, even apart from the evidence that the TLVs, NOELs, and LOELs for AvJet all substantially exceed the maximum, "worst-case" concentration to which Ms. Cavallo was exposed on the night of the spill. Therefore, summary judgment is appropriate.[46]

■■■ Prior to *Daubert*, courts presented with this situation may have been more inclined to admit the expert testimony and allow the jury, aided by vigorous cross-examination, to sort out the relative reliability of opposing expert opinions. But *Daubert* recognized the danger in this approach. By definition, experts testify to matters beyond the common understanding of the jury, and, as a consequence, their opinions can carry great weight. Given this, *Daubert* assigned district courts a more vigorous role to play in ferreting out expert opinion not based on the scientific method. At the same time, however, courts must be cautious to avoid weighing the relative merits of opinions that *are* derived from scientifically valid methodology or assuming the role of amateur scientist. In granting the motion in limine, thereby paving the way for summary judgment, the Court scrupulously attempted to walk this fine line: analyzing the experts' adherence to the scientific methodology, while declining to weigh

**44.** That Ms. Cavallo's initial consultations with physicians failed to disclose any significant injury, and that her chronic sinusitis and pulmonary disease were diagnosed only one and a half years after the spill, renders the temporal relationship between the spill and her injuries less than compelling. Furthermore, there is no evidence that a substantial number of others who were exposed to vapors from the spill are experiencing similar effects. While it appears that some firemen (who dealt directly with clean-up efforts and were presumably exposed to much greater concentrations of AvJet vapors) experienced some initial adverse effects, there is no evidence in the record that any of them suffered permanent injury.

**45.** See, e.g., *Rohrbough by Rohrbough v. Wyeth Lab., Inc.*, 719 F.Supp. 470, 473 (N.D.W.Va. 1989) (because of "high degree of scientific com-

plexity" in proving that vaccine caused plaintiff's injuries, expert testimony was required to prove causation), *aff'd* 916 F.2d 970 (4th Cir.1990); *Porter*, 9 F.3d at 612 (expert testimony required to establish link between ibuprofen and renal failure); *Bradley*, 852 F.Supp. at 697 (stating that "plaintiffs may not make out causation *vis-a-vis* MCS merely by reliance upon the temporal congruity of the [exposure] and the onset of their symptoms").

**46.** Summary judgment is appropriate with respect to Ms. Cavallo's claim for chronic illness, which is, it appears, the only claim she is making. *See supra* note 7. Should Ms. Cavallo consider that her complaint also encompasses the immediate and temporary effects of irritated eyes and runny nose on the night of the spill, then she may seek reconsideration, for the Court has not addressed that issue.

the evidence before it. Significantly, nothing in the Court's review and analysis of this issue required any scientific training.[47] Rather, the Court did nothing more than use the customary legal tools of logical reasoning[48] to carry out its gatekeeping function.

### IV. Conclusion

For the foregoing reasons, the motion in limine and the motion for summary judgment are granted.

An appropriate order has already issued with respect to the motion in limine, and an order reflecting the disposition of the summary judgment motion will issue forthwith.

---

47. While I have an undergraduate degree in science, almost 35 years has passed since I have had any professional involvement with science. Moreover, the Court's clerks are both blissfully innocent of any scientific training. Proper application of *Daubert* simply does not require that district judges be trained scientists.

48. Although the Court's application of these customary legal tools may ultimately be deemed erroneous, the error would stem from flawed legal reasoning and not from lack of scientific training.