**Honey CHIKOVSKY, et al., Plaintiffs,**

**v.**

**ORTHO PHARMACEUTICAL CORPORATION, Defendant.**

**No. 92–6628–CIV.**

United States District Court, S.D. Florida.

Sept. 23, 1993.

---

Edward W. Gerecke, Carlton, Fields, Ward, Emmanuel Smith & Cutler, Tampa, FL.

Keith Shafer, Hollywood, FL.

## SUMMARY FINAL JUDGMENT

RYSKAMP, District Judge.

THIS CAUSE came before the Court upon Defendant's Motion for Summary Judgment. The Court heard oral argument on September 15, 1993.

## I. *Introduction*

While pregnant with Honey Chikovsky, Sara Chikovsky applied Retin–A twice daily to her face and neck as an acne treatment. Honey Chikovsky was born with an imperforate anus, ears which are bowl shaped and lack rims, the top of one ear folded over toward the front of her head, the second and fourth toes on both feet overlapping the middle toe, and the second toe of the left foot bifurcated with no toenail. Plaintiffs contend that Sara Chikovsky's use of Retin–A during pregnancy caused Honey's birth anomalies. Defendant denies that Retin–A caused Honey's birth defects, and asserts the birth anomalies are consistent with a genetic condition.

As an element of their case, the plaintiffs must show that the defendant's product proximately caused their injuries. The defendant contends that it is entitled to summary judgment because the plaintiffs cannot establish that Sara Chikovsky's use of Retin–A caused Honey's birth defects. The defendant claims that there is no genuine issue of material fact with respect to causation and it is entitled to summary judgment as a matter of law.

## II. *Standard for Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). The Supreme Court has interpreted Rule 56 to mean that *"some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the party opposing the summary

judgment may not rely on the pleadings or mere denials of the allegations. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party must go beyond the pleadings and adduce some evidence showing that material facts are in dispute. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Rule 56 requires the nonmoving party to show through depositions, affidavits, answers to interrogatories and admissions on file that specific facts present a genuine issue for trial. *Id. See also Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

In accordance with Supreme Court precedent, the Eleventh Circuit has enunciated clearly the method for allocating burdens in a summary judgment proceeding:

> The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment.

*Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991).

### III.  *Analysis*

#### A.  *Defendant's Burden*

In analyzing the defendant's motion for summary judgment, the Court must first decide whether the defendant has met its burden of establishing that there is no genuine issue of material fact with respect to causation. Defendant contends that there is no evidence linking Sara Chikovsky's Retin-A use to Honey's birth defects. Defendant argues instead that Honey's birth anomalies are consistent with a genetic condition called Townes–Brock Syndrome.

The defendant has offered several affidavits in support of its position that Honey's birth defects were not caused by Sara Chi-

kovsky's Retin–A exposure. Specifically, the defendant has submitted the affidavit of Dr. George Thorne, M.D. He is the Senior Director of Clinical Research in Dermatology at R.W. Johnson Pharmaceutical Research Institute, a division of Ortho Pharmaceutical Corporation. (Thorne Affidavit at 1). Dr. Thorne is responsible for the clinical research involving various formulations of Retin–A. (*Id.*).

Dr. Thorne's affidavit states that studies performed by the research arm of Ortho Pharmaceutical Company indicate that absorption of topically applied Retin–A is minimal, with endogenous amounts of Retin–A remaining essentially unchanged after Retin–A treatment. (*Id.* at 3). Further, Dr. Thorne's affidavit states that Retin–A does not cause birth defects. (*Id.* at 2).

Dr. Thorne noted that there are studies indicating that Accutane, another Vitamin A derivative [1] used to treat acne, is a teratogen.[2] (*Id.* at 2). Dr. Thorne, however, distinguished the use of Accutane from the use of Retin–A. His affidavit states that Accutane is taken orally and in much higher doses than Retin–A.[3] *Id.* Based on these observations, Dr. Thorne concluded that Retin–A is not a teratogen and that Sara Chikovsky's Retin–A use did not cause Honey's birth defects. (*Id.* at 3).

The defendant also cites the affidavit of Dr. Lewis B. Holmes, M.D. Dr. Holmes is a professor of Pediatrics at Harvard Medical School and Chief of the Embryology–Teratology Unit at the Massachusetts General Hospital. (Holmes affidavit at 1). Dr. Holmes' affidavit states that there is no scientific proof, either by epidemiological review or absorption study, that the use of Retin–A by a pregnant woman causes birth defects. (*Id.* at 3–4). In addition, Dr. Holmes' affidavit states that Honey's birth defects are completely unlike those found with Accutane exposure. (*Id.* at 4). After reviewing Honey Chikovsky's medial records, photographs and various deposition transcripts, Dr. Holmes is

---

1.  Retin–A is a Vitamin A derivative.

2.  A teratogen is a substance that causes birth defects.

3.  His affidavit states that a one-month supply of Retin–A contains less active ingredient than a one day dose of Accutane. (Thorne affidavit at 3).

of the opinion that Sara Chikovsky's use of Retin–A did not cause Honey's birth defects. (*Id.* at 2). Dr. Holmes finds that Honey's birth defects are more consistent with the genetic disorder Townes–Brock Syndrome. (*Id.* at 2).

In addition, the defendant submitted the affidavit of Dr. Karl H. Muench, M.D., Chief of the Division of Genetic Medicine and a Professor at the University of Miami Medical School. Dr. Muench's affidavit states that Honey's anomalies are wholly unrelated to Sara Chikovsky's use of Retin–A during pregnancy. (Muench affidavit at 2). Further, Dr. Muench found that Honey's birth defects were not even consistent with Accutane exposure, rather they were consistent with Townes–Brock Syndrome. (*Id.* at 2).

The defendant has come forward with affidavits of various doctors and research scientists indicating that Retin–A is not a teratogen. In addition, defendant's experts have indicated that it is their opinion, with a reasonable degree of medical certainty, that Sara Chikovsky's use of Retin–A while pregnant with Honey Chikovsky did not cause Honey's birth anomalies. The Court finds that the defendant has met its burden of showing that there is no genuine issue of material fact that should be decided at trial with respect to whether Sara Chikovsky's use of Retin–A caused Honey's birth defects.

### B. Plaintiffs' Burden

Having found that the defendant has met its burden, the Court must determine whether the plaintiffs have met their burden. The Court must assess whether the plaintiffs adduced evidence which establishes a genuine issue of material fact that precludes summary judgment.

Originally the plaintiffs purported to rely on three experts. At the hearing on September 15, 1993, however, the plaintiffs conceded that the testimony of Dr. Mash, Ph.D, would not create an issue of material fact to preclude summary judgment. In addition, the plaintiffs have declined to rely on the testimony of Dr. Benke, M.D., because he has

testified that the he does not believe that Honey's birth anomalies were caused by Sara Chikovsky's use of Retin–A. (Benke deposition at 9, 43–44). The plaintiffs have indicated that they intend to rely solely on the opinion of Dr. Bertman, M.D. Therefore, the Court will focus it analysis exclusively on the validity of the bases for his opinions.

Defendant contends that under the recent Supreme Court opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) that Dr. Bertman's opinions are inadmissible. Without Dr. Bertman's testimony, the defendant asserts that the plaintiffs cannot establish a genuine issue of material fact regarding causation of Honey's birth anomalies and, thus, the defendant is entitled to summary judgment as a matter of law.

In *Daubert,* the Supreme Court set forth the standard for the admissibility of expert testimony. The Court found that the former test for determining the admissibility of expert testimony as set out in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)[4] had been superseded by the Federal Rules of Evidence. —— U.S. at ——, 113 S.Ct. at 2797. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of opinion or otherwise.

F.R.E. 702. The Court reasoned that the fact that the *Frye* test was displaced by the Rules of Evidence did not mean that there were no limits on the on the admissibility of purportedly scientific evidence. *Id.* at ——, 113 S.Ct. at 2794–95. "To the contrary, under the Rules, the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at ——, 113 S.Ct. at 2795.

In accordance with Rule 702, the subject of an expert's testimony must be " 'scientific ... knowledge.' " *Id.* (*quoting* F.R.E. 702).

---

**4.** In *Frye,* the District of Columbia Circuit announced that in order to be admissible a scientific principle or discovery must "have gained general acceptance in the particular field in which it belongs." *Id.* at 1014.

"The adjective 'scientific' implies a grounding in the methods and procedures of science. *Id.* Similarly, the word 'knowledge' *connotes more than a subjective belief or unsupported speculation.*" *Id.* (emphasis added). The Court reasoned that the requirement that an expert's testimony concern "scientific knowledge" establishes a standard of evidentiary reliability based upon scientific validity. *Id.*

Rule 702 also requires that the evidence or testimony " 'assist that trier of fact to understand the evidence or to determine a fact in issue.' " *Id.* (*quoting* F.R.E. 702). The Court reasoned that this requirement goes primarily to relevance. *Id.* The "helpfulness" standard imposes a prerequisite to admissibility that the testimony or evidence have a valid scientific connection to the pertinent inquiry. *Id.* at ——, 113 S.Ct. at 2796.

■ Thus, when faced with a proffer of expert scientific testimony, a trial judge first must determine, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. *Id.* The Court declined to impose a mechanical test, but offered some guidance to federal judges in their evaluation of scientific testimony.

■ An issue of primary importance in the determination of whether a theory or technique is "scientific knowledge" that will assist the trier of fact is "whether it can be (and has been) tested." *Id.* Another significant consideration is whether the theory or technique has been subjected to peer review and publication. *Id.* at ——, 113 S.Ct. at 2797.[5] In addition, when examining a particular scientific technique a court should consider the known or potential rate of error, and the existence and maintenance of standards controlling the operation of the technique. *Id.* The Court added that "general acceptance" can have bearing on the inquiry. An assessment of reliability permits, but does not require assessing the degree of acceptance. *Id.*

■ Having considered *Daubert,* the Court now must determine whether the testimony of the plaintiffs' proposed expert witness, Dr. Bertman, is admissible. The Court must examine the bases for his opinions: "The focus, of course, must be solely on principles and methodology not on the conclusions [he] generate[s]." *Id.* at ——, 113 S.Ct. at 2797.

Dr. Bertman is an obstetrician/gynecologist. He has no specialized training in embryology or teratology. He has testified that in his opinion Retin–A is a teratogen. (Bertman deposition I at 21). Dr. Bertman, however, did not rely on any published material in forming his opinion that the topical application of Retin–A causes birth defects. (Bertman deposition II at 34, 36). In fact, Dr. Bertman is not aware of any published article or treatise which reports any study that has found that Retin–A causes birth defects. (*Id.* at 34).

Although publication is not the only factor a trial judge must consider, it does not seem that there is any published material linking topical Retin–A exposure during pregnancy to birth defects. Closely tied to this lack of publication, is the fact that Dr. Bertman's scientific theory—that a pregnant woman's topical application of Retin–A during pregnancy causes birth defects—has not been tested. This is evidenced by the total lack of data linking Retin–A to birth defects.[6]

Dr. Bertman testified that the dose of a particular substance is relevant in determining whether it acts as a teratogen. (Bertman deposition I at 34). He, however, does not know of any studies indicating the absorption rate of Retin–A by pregnant women applying the drug topically. (*Id.* at 30). More specifically, he does not know how much Retin–A Sara Chikovsky might have absorbed through her skin during her pregnancy with Honey. (*Id.* at 32).

Dr. Bertman testified that he based his opinions regarding Retin–A on studies pertaining the teratogenic effects of high doses

---

**5.** Publication, however, is not an indispensable prerequisite for admissibility. *Id.*

**6.** The Court does not address the "general acceptance" analysis because the Court has not been presented with any evidence concerning whether the scientific or medical community generally accepts this theory.

of Vitamin A and certain other Vitamin A derivatives. For example, he relies on published studies that indicated that high doses of Vitamin A could cause fetal harm when administered to a pregnant woman. (*Id.* at 14). Dr. Bertman testified, however, that he prescribes prenatal vitamins, which contain Vitamin A, to his pregnant patients. (*Id.* at 38). Further, he testified that he did not know at what dosage level Vitamin A became unsafe for use by pregnant women. (*Id.* at 39). Most significant is the fact that Dr. Bertman has performed no comparisons between the dose of Vitamin A in the study and that found in Retin–A. (*Id.* at 15).

Dr. Bertman also relied on studies dealing with Accutane, another acne medication derived from Vitamin A. (*Id.* at 22, 24–25). Dr. Bertman, however, stated that there are not enough studies on Retin–A to determine whether the birth defects associated with Accutane are associated also with Retin–A. (Bertman deposition II at 33–34). The Court finds that Dr. Bertman's analogies to research concerning Vitamin A and other Vitamin A derivatives is wanting.

In addition, Dr. Bertman is not a geneticist. (Bertman deposition I at 48–49; Bertman deposition II at 57). Dr. Bertman has done no genetic studies to determine whether there are genetic explanations for Honey's birth defects. (Bertman deposition I at 43). In fact, Dr. Bertman has testified that he does not rule out the possibility that Honey's birth defects were induced by some genetic cause. (*Id.* at 45).

Dr. Bertman testified that in basing his opinion that Retin–A is teratogenic he relies "also [on his] common sense that there is [sic] teratogenic effects of Retin–A that hasn't [sic] been given to the public yet." (*Id.* at 24). The Court cannot find that this basis for Dr. Bertman's opinions makes them anymore scientifically valid. As the *Daubert* Court instructed, "'knowledge' *connotes more than a subjective belief or unsupported speculation.*" *Daubert*, —— U.S. at ——, 113 S.Ct. at 2795. This is precisely the kind of

evidence that the trial judge must exclude in performing the gatekeeper function.

The Court finds as a matter of law that Dr. Bertman's opinions are not based on scientifically valid principles and, therefore, do not meet the reliability requirements of Rule 702 as interpreted by the Supreme Court in *Daubert*.[7] In accordance with Supreme Court mandate, this Court must perform its gatekeeping role and exclude his testimony. Without Dr. Bertman's testimony, the plaintiffs cannot establish a genuine issue of material fact as to causation. Therefore, the Court finds that the defendant is entitled to summary judgment as a matter of law.[8] It is hereby

ORDERED AND ADJUDGED that the Defendant's Motion for Summary Judgment is GRANTED. FINAL JUDGMENT is hereby ENTERED. Any remaining pending motions are DENIED as MOOT.

DONE AND ORDERED.

---

7. The Court does not address whether Dr. Bertman's opinions would be helpful to the trier of fact, having excluded them already under the first prong of the *Daubert* test.

8. Plaintiffs also contend that the warnings on Retin–A were inadequate with respect to use by pregnant women. Having found as a matter of law that plaintiffs have not established causation, it is unnecessary for the Court to address the adequacy of the warnings.