Brassard, J.
On November 15, 16, and 19, 1999, this matter was before the court for evidentiary hearings on the motion of defendant Fisons Corporation (“Fisons”) to exclude the expert testimony of plaintiffs’ experts, Dr. Paul Wellman (“Dr. Wellman”) and Dr. Alan Woolf (“Dr. Woolf’).[3] Plaintiffs Thomas and Mary Linnen (“the Linnens”) allege that the 1996 death of their 30-year-old daughter Mary Linnen (“Ms. Linnen”) from pulmonary hypertension was caused by short-term ingestion of the diet pills phentermine and fenfluramine (“phen/fen”). To support this allegation, plaintiffs offer the expert opinion of Dr. Wellman, a Professor of Psychology who is Chairman of the Psychology Department and a member of the Faculty of Neuroscience at Texas A&M University. Dr. Wellman is a behavioral psychologist and animal researcher who studies the pharmacological and neurochemical bases of anorexia induced by appetite suppressant *41 drugs. Dr. Wellman has lectured and published on neurochemical and pharmacological mechanisms by which appetite suppressants reduce eating in animals. Dr. Alan Woolf, a physician toxicologist and director of the Massachusetts Poison Control Center, supports Dr. Wellman’s hypotheses based on his own review of the literature and his background in medical research.
Fisons, the manufacturer of the phentermine prescribed for and taken by Ms. Linnen, moves to exclude as scientifically unreliable Dr. Wellman’s testimony that phentermine, alone or in combination with fenfluramine, causes or contributes to the development of pulmonary hypertension. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993); Commonwealth v. Lanigan, 419 Mass. 15, 27 (1994).
Dr. Wellman and three defense experts submitted summaries of their proposed testimony, and were cross examined at the hearings by opposing counsel. The defense experts are Dr. Michael Decker (“Dr. Decker”), Dr. Michael D. Gershon (“Dr. Gershon”) and Dr. Victor Tapson (“Dr. Tapson”). Dr. Decker, a practicing physician who specializes in infectious diseases, is Associate Professor of Preventive Medicine at Vanderbilt University School of Medicine. Dr. Gershon, a physician who works as a research biologist in cellular and development neuroscience and conducts research on the role of seratonin in the human body, is Professor and Chairman of the Department of Anatomy and Cell Biology of the Columbia University College of Physicians and Surgeons. Dr. Tapson, a physician who is Medical Director of the Duke Lung Transplant Program and Director of the Duke Pulmonary Outpatient Program, a pulmonary hypertension clinic, is an Associate Professor of Medicine at Duke University Medical Center.
For the following reasons, the motion to exclude the expert testimony of Dr. Wellman is ALLOWED.
BACKGROUND
In February 1997 Ms. Linnen died from pulmonary hypertension. The issue in this case is whether Ms. Linnen’s development of pulmonary hypertension and her resulting death were caused by her ingestion of phen/fen for approximately 3 weeks in May 1996. Defendant Fisons alleges that there is no scientific evidence linking its product, phentermine, to the development of pulmonary hypertension. Testifying as an expert for the plaintiffs, Dr. Wellman presents a three-part hypothesis that ingestion of phentermine, alone or in combination with fenfluramine, contributes to the development of pulmonary hypertension by elevating the levels of seratonin in the body. Dr. Well-man maintains that:
1.Case reports reveal an association between phentermine and primary pulmonary hypertension (PPH).
2. Other appetite suppressants, which have a chemical structure and pharmacology similar to that of phentermine, have been shown to affect the levels of circulating seratonin in the body.
3. High seratonin levels have been shown to cause or to be likely risk factors for the development of pulmonary hypertension.
Dr. Wellman concludes that, because phentermine has chemical similarities to other appetite suppressants that increase levels of seratonin, phentermine, alone or in combination with fenfluram-ine, increases the risk of developing pulmonary hypertension. As part of this theory, Dr. Wellman postulates that phentermine has a synergistic effect when ingested with fenfluramine, increasing fenfluramine’s likelihood of causing pulmonary hypertension.[4]
In support of his hypothesis, Dr. Wellman relies on a variety of materials, including case reports, studies of other drugs that are pharmacologically related to phentermine, studies of the physiological effects of seratonin on animals, and an article he co-authored with Dr. Timothy Maher of the Massachusetts College of Pharmacy and Health Sciences entitled “Synergistic Interactions Between Fenfluramine and Phenterm-ine.” This peer-reviewed article was published in the International Journal of Obesity in 1999.
Dr. Wellman’s Theories and Defendants’ Opposition
Before applying the Daubert analysis to Dr. Wellman’s hypothesis, the court reviewed the major studies on which Dr. Wellman relied, the conclusions he drew from those studies, and the challenges raised to his theories by defense experts, both at the hearing and in comprehensive submissions to the court. In this section, the court sets forth the testimony at issue. In the Discussion section which follows, the court will analyze Dr. Wellman’s theories in light of the controlling law and make conclusions as to their scientific validity.
1. Case reports link phentermine exposure to PPH
In asserting that phentermine alone causes primary pulmonary hypertension, Dr. Wellman relies on his literature review of studies of anorectic drugs in Europe in the 1970s. These studies included case reports of approximately ten patients with pulmonary hypertension who reported taking phentermine.
Dr. Wellman also quotes a 1976 Schnabel et al study, which states that sympathomimetic drugs (Oxymetazoline, Phentermine) are able to cause pulmonary hypertension “when used over a long period of time and if the particular disposition is existing.” Dr. Wellman acknowledges that Schnabl based this report on a single case of PPH after exposure to phentermine.
In addition, Dr. Wellman relies on case reports of Backmann et al (1972) reporting five cases of PPH *42 associated with phentermine, and a single case reported by Heuer et al in 1978. Dr. Wellman also reports a recent finding by Rezai-Mejd that three additional 1970s cases of PPH associated with phentermine were excluded from an analysis of valvular heart disease in PPH patients taking Aminorex.[5]
Finally, Dr. Wellman states that an association between phentermine and the development of PPH is supported by Fison’s adverse event records, which disclose three cases of PPH in persons taking phentermine between 1994 and 1997.
Dr. Wellman has presented no evidence, however, that these conclusions regarding an association between phentermine and pulmonary hypertension are based on acceptable scientific methodology. In criticizing this portion of Dr. Wellman’s hypothesis, Dr. Decker explains that “the generally accepted scientific methodology” for establishing whether exposure causes a disease is based upon a two-step process. First, data from controlled human studies are examined to determine whether there is a statistically significant association between the disease and the exposure. Second, if such an association is demonstrated, scientists evaluate the likelihood that the association is causal in nature. Dr. Decker states that, in the absence of such controlled human studies, although it is possible to form hypotheses concerning the existence of an association, there is no scientifically valid basis for determining that a substance causes or contributes to the disease.
Dr. Decker also explains why case reports alone are not sufficient to establish a causal relationship between exposure and disease. “Case reports cannot be relied upon to establish association or causation between exposure and disease because they do not include control groups. The absence of a control group makes it impossible to determine whether the occurrence of the disease in a reported individual is attributable to the exposure or whether it would have occurred in the individual even absent the exposure.”
Dr. Tapson points out that the rate of spontaneous occurrence of PPH, known as the “background rate,” is one or two per million people per year. Dr. Tapson notes that there is no evidence that the published case reports relied on by Dr. Wellman to establish an association between phentermine and pulmonary hypertension exceed the background rate.
2. Drugs with pharmacology and chemical structure similar to that of phentermine increase levels of circulating seratonin.
In attempting to create analogies between the effects of phentermine and those of “pharmacologically similar” drugs, Dr. Wellman relies primarily on the anorectic drug Aminorex, which was found to cause pulmonary hypertension in humans in Europe in the 1970s. Dr. Wellman reports that studies of the pharmacology of Aminorex have shown that Aminorex has three separate effects on seratonin in the body. Aminorex increases the levels of circulating seratonin (seratonin found in blood plasma) because it 1) causes release of seratonin from platelets, 2) inhibits seratonin reuptake, and 3) acts as a monoamine oxidase inhibitor (“MAOI”).[6]
Relying primarily on animal studies, Dr. Wellman suggests that, because of its pharmacological similarity to Aminorex, phentermine will release seratonin and inhibit MAO in humans. Dr. Wellman postulates, therefore, that phentermine, either alone or in combination with fenfluramine, will increase blood levels of seratonin. In addition, Dr. Wellman reports that, like Aminorex, fenfluramine releases seratonin and inhibits seratonin reuptake. Dr. Wellman concludes, therefore, that fen-phen “recreates” all three of the actions on circulating seratonin found in Aminorex, which was found to cause pulmonary hypertension.
One of the studies on which Dr. Wellman relies is a 1972 study by the German scientist Mielke showing that Aminorex caused a significant release of seratonin in the lungs, producing an increase in pulmonary pressures. Dr. Wellman also relies on 1973 and 1974 studies by Seiler in Germany showing that Aminorex influences seratonin because it is a mono-amine oxidase inhibitor (“MAOI”) and a seratonin reuptake inhibitor.
In 1975 Seiler published the results of a study on the role of seratonin in the development of pulmonary vascular resistance in rat lungs. Seiler found that, using a concentration of 100 times the human therapeutic level, phentermine prolonged the vasoconstric-tive action of seratonin in an isolated rat lung, indicating the properties of an MAOI.
In support ofhis hypothesis, Dr. Wellman notes that Aminorex and fen-phen are both associated with two very rare diseases (PH and heart valve disease) for which excessive seratonin levels are the common denominator. Dr. Wellman also reports that “the mixture in phentermine and fenfluramine were reported in 1984 to produce ’’synergistic effects on appetite, a variable that has been reliably linked to increased seratonin activity in brain (sic). Moreover, animal studies clearly show that phentermine increases the anorexic activity of dex-fenfluramine and increases the impact of this drug on brain seratonin levels." Similarly, Dr. Wellman asserts that because fenfluramine increases plasma levels of seratonin in animals and humans, “based on the known pharmacology of phentermine, we can predict that fen-phen will a (sic) least prolong, if not increase, that effect.”
As further support ofhis hypothesis, Dr. Wellman reports that “four animal studies indicate that phentermine inhibits MAO activity.” A 1977 study by Fristrom in Finland showed that a variety of drugs, including phentermine, released seratonin from rabbit platelets to plasma. Fristrom identified a connection between increased seratonin levels and pulmonary hypertension. Based on these studies, Dr. Wellman *43 postulates that phentermine increases levels of plasma seratonin because it is an MAOI. In addition, Dr. Wellman states that in 1999, Maher et al reported in the British medical journal Lancet that administration of 15 mg of phentermine was sufficient to increase platelet seratonin levels in human volunteers. Although Dr. Maher did not directly measure MAO activity within human platelets, Dr. Wellman states that Dr. Maher’s results are “consistent with phentermine being an MAOI, and, indeed, I can think of no other explanation for the results ...”
Dr. Wellman acknowledges, however, that “there are no studies involving humans that have examined changes in plasma seratonin to a combination of fenfluramine and phentermine,” and that such studies are no longer possible because fenfluramine was withdrawn from the market in 1997.
In criticizing Dr. Wellman’s hypothesis that phentermine can be assumed to increase human levels of plasma seratonin because it has chemical and pharmacological similarities to other appetite suppressants, Dr. Gershon testified that “there is no reliable scientific evidence that clinical doses of phentermine increase blood plasma seratonin levels.” Dr. Gershon explained that there is no scientific data to support Dr. Wellman’s assertion that phentermine affects any of the three mechanisms involved with regulating seratonin in the human body. “There is no published scientific data that clinical doses of phentermine, when taken alone or in combination with fenfluramine . . . increase blood plasma seratonin levels in humans, . . . inhibit the uptake of seratonin by platelets or other cells ... or inhibit the activity of the MAO system.” In challenging Dr. Wellman’s hypothesis that phentermine at clinical doses is an MAO inhibitor, Dr. Gershon reports that “phentermine has never been considered a MAO inhibitor by the scientific community or the U.S. Food and Drug Administration.”
Dr. Decker testified that “animal studies have limited applicability to humans due to important differences between animals and humans, including differences in the bodies’ reactions to a drug.” Dr. Wellman acknowledges that the doses administered in animal studies are significantly higher than clinical doses for humans. He explains, however, that because higher doses of anorectic drugs are required to affect appetite in animals than in humans, results from animal studies may correctly be extrapolated to humans. He offers no scientific data to support this assertion.
Dr. Wellman also maintains that chlor phenter mine, which has been “strongly associated with pulmonary hypertension," is chemically related to phentermine, and that amphetamines as a drug class have been found by the World Health Organization World Symposium on PPH to be a “very likely” risk factor for pulmonary hypertension. He notes that phenter mine’s label states that it is “related chemically and pharma-cologically to amphetamine.” Dr. Decker asserts, however, that it is “scientifically inappropriate” to use information pertaining to other drugs as a basis for drawing conclusions about phentermine. Dr. Gershon explains that “it is a basic tenet of pharmacology that to accurately assess the actions of a drug in the human body, the clinical and scientific evidence of that drug must be examined. This is because even the slightest differences among chemical substances can produce profoundly different effects in the human body.”
3. Because seratonin plays an important role in the development of pulmonary hypertension, phentermine, alone or in combination with fenfluramine, increases the risk of developing pulmonary hypertension.
Dr. Wellman reports a number of scientific studies that have established an association between levels of circulating seratonin and the development of pulmonary hypertension. A French pulmonologist, Herve, published in the American Journal of Medicine, the results of studies showing that humans with pulmonary hypertension have higher levels of plasma seratonin than controls. Herve reported in a separate paper in the same journal that a patient with a familial seratonin storage disorder leading to high plasma seratonin concentration developed pulmonary hypertension. Similarly, in 1993, a French pharmacologist, Brenot, reported that humans with pulmonary hypertension have higher concentrations of free plasma seratonin than controls.
Dr. Wellman relies also on a number of studies demonstrating that “seratonin contracts pulmonary arteries and causes proliferation of vascular smooth muscle cells.” Thus, Dr. Wellman reports that Dr. Alfred Fishman, an expert on pulmonology, wrote in a peer-reviewed journal that “seratonin is a ‘powerful vasoconstrictor.’ ” Likewise, two published papers from 1988 and 1992 found that the fawn-hooded rat, a species with an inherited platelet disorder and a corresponding increase in plasma seratonin, have a “genetically determined idiopathic form of dietary pulmonary hypertension.” Dr. Wellman concludes from these and other studies that “scientists who have studied diet-drug induced PH expect that pulmonary artery vasoconstriction and cellular proliferation are central to the development of PH.” Similarly, Dr. Well-man reports that a 1999 review article in the journal Thorax concluded that “ ‘most authorities’ agree that seratonin plays an important role in the pathogenesis of dietary pulmonary hypertension.”
In challenging Dr. Wellman’s hypothesis that ingestion of phentermine results in increased seratonin levels that cause pulmonary hypertension, Dr. Tapson explains that there are a number of known underlying causes of pulmonary hypertension, including, among others, congenital abnormalities; heart defects; sickle cell anemia; collagen vascular diseases such as rheu *44 matoid arthritis and scleroderma; and certain disorders associated with obesity, such as sleep apnea syndrome.
In addition, primary pulmonary hypertension (PPH), refers to pulmonary hypertension that does not have a demonstrable cause. Because PPH occurs spontaneously in the general population at the rate of one or two per million, there are certain risk factors that are known to be associated with the disease, including genetic/familial disposition, sex, age, drug use, and HIV infection. In order to determine that a particular substance or condition causes pulmonary hypertension, therefore, Dr. Tapson states that it is necessary to rule out other known risk factors.
Dr. Decker explains that because background rates exist for most diseases, no presumption can be made as to the cause of an individual case of the disease without a controlled epidemiological study. A recent epidemiological study (IPPH) reports a statistically significant association between PPH and the use of fenfluramine for more than three months. The IPPH study contains no findings concerning phentermine, either alone or in combination with fenfluramine.
Dr. Tapson notes that although there have been, and continue to be, many hypotheses about the biological mechanism for PPH, “it is generally accepted in the scientific community that the biological mechanism has not been proven.” Thus, any theory of how any substance may contribute to a hypothesized mechanism of PPH causation does not establish that that substance contributes to, causes, or is associated with PPH, “only that it is a hypothesis which requires further experimentation and testing.”
Dr. Tapson states that “it is generally accepted in the scientific community, that in forming a conclusion that an agent causes a disease, one cannot rely on theories about the biological mechanism by which the agent is suspected of causing the disease where there are not epidemiological studies to support such hypotheses.”
DISCUSSION
A. Daubert-Lanigan Analysis
In determining the admissibility of scientific evidence, the court must act as a gatekeeper to determine whether the proposed evidence is reliable. See Daubert v. Merrell Dow, supra; Commonwealth v. Lanigan, supra. An expert is permitted to present opinions “that will assist the trier of fact to understand the evidence or to determine a fact in issue.” Daubert at 588. Because of their specialized knowledge, experts are subject to more liberal rules of evidence than other witnesses. They may testify to opinions and may base those opinions on facts and data not in evidence. Id. Moreover, a jury may tend to give special deference to the opinion of an expert. See Commonwealth v. Vitello, 376 Mass. 426, 453 (1978) (“juries often imbue the machinery of science with an air of mysterious infallibility”).
To ensure that expert opinions are sufficiently reliable to assist the trier of fact, an expert must be able to demonstrate that his conclusions are based on scientific knowledge, with “scientific” defined as implying “a grounding in the methods and procedures of science, and ’’knowledge" defined as connoting “more than subjective belief or unsupported speculation.” Daubert at 590. To satisfy this standard, an expert witness must show that his opinions “have been arrived at in a scientifically sound and methodologically reliable fashion.” See Ruiz-Troche v. Pepsi-Cola of Puerto Rico, 161 F.3rd 77 (1st Cir. 1998). The issue addressed in this motion is whether Dr. Wellman’s testimony satisfies that standard.
In determining whether expert opinions constitute reliable scientific testimony, a court may apply the non-exhaustive standards set forth in Daubert, supra. Daubert and its progeny teach that to determine whether expert testimony is admissible, the court must make a “preliminary assessment of whether the reasoning or methodology underlying an expert’s testimony is scientifically valid and whether the reasoning or methodology properly can be applied to the facts in issue.” Commonwealth v. Lanigan, 419 Mass. 15, 26 (1994), quoting Daubert at 592-593.
Prior to Daubert the standard for admissibility of scientific evidence was that “the community of scientists involved generally accepts the theory or process.” See Frye v. United States, 293 F. 1013 (D.C. Cir. 1923). Application of that standard alone, however, sometimes kept reliable evidence from the factfinder. Commonwealth v.Lanigan, 419 Mass. at 24. In adopting the reasoning of Daubert, the Supreme Judicial Court agreed that a broader test than Frye was needed to determine the admissibility of expert testimony, although the Court suggested that acceptance in the scientific community might continue to be the most important factor. Id.at 26.
Dr. Wellman presents a three-part hypothesis that phentermine, alone and in combination with fenfluramine, causes or contributes to the development of pulmonary hypertension. To date, there are no published epidemiological studies as to any relationship or association between phentermine and pulmonary hypertension. Dr. Wellman bases his hypothesis on a comprehensive and thoughtful analysis of the scientific literature, case reports, studies of related drugs with chemical structures similar to that of phentermine, and animal and human studies of the role of seratonin in the development of pulmonary hypertension. From his review of these materials, Dr. Wellman has reached conclusions and formed hypotheses about the causative relationship between phentermine and pulmonary hypertension.
In determining whether an expert’s methodology is scientifically reliable, the focus must be on principles and methodology, not on the conclusions themselves. Daubert at 595. There are certain non-exhaustive *45 factors the court may consider in determining the reliability of scientific opinion: 1) whether the theory has been subjected to peer review and publication, 2) whether the theory has been tested, 3) whether the theory has a known error rate and 4) whether the theory has general acceptance in the relevant scientific community. Lanigan at 26. In applying these factors to Dr. Wellman’s hypotheses, this court has carefully reviewed the testimony of the expert witnesses and the submissions of the parties. The court finds that Dr. Wellman’s hypotheses, while carefully researched and reasoned, do not at this time rise to the requisite level of scientific reliability.
1. Peer Review and Publication
Plaintiffs argue that Dr. Wellman’s theories are scientifically valid because they were presented in a published peer review article co-authored by Dr. Well-man. Peer review and publication is an important element in determining whether a scientific theory is reliable, because it “increases the likelihood that substantive flaws in methodology will be detected.” Daubert at 593. Peer review alone, however, does not necessarily assure scientific reliability. Id. If the proposed theory is not based on sound scientific methodology, the expert’s opinion is not sufficiently reliable to assist the trier of fact. Id.
2. Testing
Based on his review of the literature and his analysis of other studies, Dr. Wellman asserts that phentermine causes increased seratonin levels in humans and that this increased seratonin level contributes to the development of pulmonary hypertension. Dr. Wellman notes in his affidavit that most of the studies on which he relies in forming his hypothesis have been subject to peer review. While the underlying theories and studies on which Dr. Wellman bases his conclusions may themselves be reliable, there is no evidence that, in formulating hypotheses based on those theories, Dr. Wellman has himself utilized sound scientific methodology in arriving at his opinions in this case. See Haggerty v. Upjohn Co., 950 F. Supp. 1160, 1163 (S.D.Fla. 1996). “Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified.” Id., quoting Daubert, 509 U.S. at 593. The fact that a theory may seem plausible does not elevate it to the level of scientific validity. Golod v. Hoffman LaRoche, 964 F. Supp. 841, 860 (S.D.N.Y. 1997). “The courtroom is not the place for scientific guesswork, even of the most inspired sort. Law lags science; it does not lead it.” Id. at 861.
There is no evidence that Dr. Wellman’s hypotheses regarding an association among phentermine, seratonin and pulmonary hypertension have been tested. At this time, therefore, Dr. Wellman’s opinions appear to be informed speculation or intelligent theory, not scientific knowledge supported and verified by testing. See Haggerty v. Upjohn, supra, at 1164. See also In re Paoli R.R. Yard PCB Litigation, 35 F.3rd 717, 764 (1994) (under Daubert analysis, Third Circuit upheld exclusion of expert causation testimony where witness was “providing only a hypothesis which he had yet to attempt to verify or disprove by subjecting it to the rigors of scientific testing”).
Analogies with chemically similar substances
As part of his analysis, Dr. Wellman draws analogies between phentermine and drugs that have been found to affect seratonin levels. In making these analogies, Dr. Wellman makes a number of analytical assumptions, but again fails to demonstrate that there is any scientific testing to support his assumptions.
Dr. Wellman bases his hypothesis primarily on studies of the appetite suppressant Aminorex, which was determined to cause pulmonary hypertension in humans in the 1970s. In connection with those studies, Dr. Wellman has identified approximately ten case reports of patients with pulmonary hypertension who reported taking phentermine. Based in part on these case reports, Dr. Wellman opines that phentermine, in combination with fenfluramine, is chemically similar to Aminorex, especially in terms of its effects on human seratonin levels. Because phentermine and fenfluramine may have similar chemical properties to those of Aminorex, particularly in relation to seratonin, Dr. Wellman postulates that phentermine has a synergistic effect on fenfluramine, increasing its causation effect on the development of pulmonary hypertension. Even in combination with fenfluramine, however, phentermine is not Aminorex. They are different drugs, and Dr. Wellman offers no evidence that he or others have conducted tests establishing that drugs with similar pharmacology cause identical effects when ingested by humans.
Where an expert attempts to testify by analogy, but has not investigated or attempted to test the proposed analogy, expert testimony has not been permitted. See Moore’s Reference Manual on Scientific Evidence at 84 (1994); see also Chikovsky v. Ortho Pharmaceutical Corp., 832 F. Supp. 341, 346 (S.D.Fla. 1993) (expert testified that high doses of other vitamin A derivatives had been implicated in birth defects, but had performed no scientific comparison with the dose of vitamin A found in defendant’s product).
Dr. Wellman also opines that phentermine is likely to increase the amount of seratonin in human plasma because it is pharmacologically similar to amphetamines, which increase seratonin levels and have been found to be “a very likely risk for pulmonary hypertension.” In making this analogy, Dr. Wellman relies on case studies reported by Backmann in the 1970’s as well as on Fison’s statement in the Physicians’ Desk Reference (“PDR”) that phentermine “is related chemically and pharmacologically to amphetamine.” Dr. Wellman acknowledged at the hearing that while the Backmann study reached general conclusions about “amphetamine-like agents,” it made no specific con- *46 elusions about phentermine. Dr. Wellman also acknowledged that there was no basis for assuming that the five cases reported in Backmann exceeded the so-called background rate of one or two cases of PPH per million in the general population.
In making the analogy with amphetamines, Dr. Wellman relies in part on a 1998 case-controlled study by French pulmonologist Gerald Simmonneau. Simmonneau found that in 27% of the cases of pulmonary hypertension associated with diet drugs, amphetamines were used in combination with fenfluramine. Wellman postulates that because phentermine’s label states that it is “chemically and pharmacologically related to amphetamines,” Simmonneau’s findings also apply to phentermine.
The attempted analogies with Aminorex and amphetamines do not ground Dr. Wellman’s opinions in sound scientific methodology. Dr. Wellman has conducted no testing to support his hypothesis that phentermine’s interactions in the human body replicate those of other drugs. Because Dr. Wellman has not otherwise validated the hypothesis, his opinion does not constitute scientific knowledge that would be helpful to the jury. See Rotman v. National Railroad Passenger Corporation, 41 Mass.App.Ct. 317, 318 (1996) (judge correctly excluded medical expert’s opinion that accident exacerbated plaintiffs preexisting eye condition where plaintiff presented no evidence that theory underlying expert’s opinion was generally accepted or had scientific validity).
Relying primarily on animal studies, Dr. Wellman also postulates that phentermine affects levels of human seratonin because it is an MAOI. Again, however, he presents no evidence of testing to support this hypothesis. Where opinion evidence is connected to existing data only by the ipse dixit of the expert, “a court may conclude that there is too great an analytical gap between the data and the opinion proffered.” See General Electric Co. v. Joiner, 118 S. Ct. 512, 519 (1997).
Absent testing on humans, courts have not found the results of animal studies probative of causation in humans where, as in this case, the animal studies involved much higher doses of a substance than that to which humans would be exposed. Id. In order to extrapolate opinions regarding humans from animal studies, a scientist must be able to explain how and why the results of those animal studies would apply to humans. Id.[7] Dr. Wellman acknowledged at the hearing that he was not aware of a formal study that has examined the effect of phentermine on human appetite.
3. Known Error Rate
Where there has been no testing of Dr. Wellman’s hypotheses, there is no way to determine the known error rate.
4. Acceptance in the Scientific Community
In his deposition testimony and at the Daubert hearing, Dr. Wellman acknowledged that his premises are not generally accepted in the scientific community. Dr. Wellman further testified that the focus of his research has been on the effectiveness of anorectic drugs in reducing appetite in laboratory animals, that the primary focus of his research is the brain, and that although he performed some research on platelet seratonin for the purposes of this litigation, he has performed no research on the heart or lungs. Dr. Wellman acknowledged that he is not an expert in pulmonary hypertension, although he has “read a substantial amount of literature.”
Where there are no published epidemiological studies, a qualified expert may rely on personal observations, clinical analysis or other types of data and scientific techniques in forming expert opinions as to causation. See Vassallo v. Baxter Healthcare, 428 Mass. 1, 12 (1998) (in products liability case regarding silicone gel implants, two physicians allowed to present expert testimony as to causation in absence of epidemiological studies where both witnesses “possessed the knowledge, skill and experience to qualify as experts in their fields, having conducted research, published in peer reviewed journals on silicone related topics, and treated hundreds of women with silicone gel implants in their clinical practices”). In this case, Dr. Wellman, while an experienced and respected researcher and lecturer on the effects of appetite suppressants on appetite in animals, acknowledged that he has no prior experience in the study of seratonin or pulmonary hypertension or in developing theories of disease causation.
Dr. Wellman testified that between ten and twenty case reports over the last 30 years support his opinion that phentermine causes pulmonary hypertension. As defendants’ experts testified, however, case reports alone are not considered reliable scientific evidence of causation. See Casey v. Ohio Medical Products, 877 F. Supp. 1380 (N.D. Cal. 1995). Case reports simply “describe reported phenomena without comparison to the rate at which the phenomena occur in the general population.” Id. at 1385.
At the hearing, Dr. Wellman was asked whether his “opinion that phentermine increases the risk [of pulmonary hypertension] when used in combination with fenfluramine” was generally accepted in the scientific community. Dr. Wellman responded that, apart from his own article, he could not “point to a scientist who has published an article that agrees with me.” Defendants’ counsel also introduced prior deposition testimony from Dr. Wellman in which he acknowledged that his opinion that phentermine increased the risk of PPH was “not generally accepted in the scientific community.”
Dr. Wellman further acknowledged that plaintiffs’ pulmonary hypertension experts in this case, Dr. Stu *47 art Rich and Dr. Robin Barst, after meeting with Dr. Wellman and reviewing his hypotheses, testified that they did not believe that the evidence relied on by Dr. Wellman supported a conclusion, to a reasonable degree of medical certainty, that phentermine causes or contributes to PPH.
Because the opinions of Dr. Wellman are not supported by reliable evidence, the motion to exclude his testimony is allowed.
B. Level of Scientific Certainty
In the first part of this opinion, this Court concludes that Dr. Wellman’s opinions are not scientifically reliable. There is a second and related reason to exclude Dr. Wellman’s opinions under the principles of Daubert and PLanigan. Dr. Wellman’s opinions in this case, which address matters of scientific knowledge and principles, are held without the requisite degree of scientific certainty by Dr. Wellman himself.
During his testimony on this motion, the court asked Dr. Wellman a series of questions as to the degree of scientific certainty with which he holds his proffered opinions. In his answers to these questions, Dr. Wellman indicated that he held many of his opinions to a “more likely than not” standard, but not to a reasonable degree of scientific certainty. Dr. Wellman testified in part as follows:
Q: Do you have an opinion, to a reasonable degree of psychological or behavioral neuroscience certainty, that phentermine, when used alone, causes primary pulmonary hypertension?
A: I would have to interpret your question to mean at the level of scientific or a medical certainty, do I hold that opinion?
Q: Yes.
A: And the answer would be, “No. I do not.”
Q: And do you have an opinion, to a reasonable degree of behavioral science certainty, that phentermine, when used in combination with fenfluramine, increases the risk of pulmonary hypertension?
A: And again, I would have to attribute the question to mean at the level of scientific or medical certainty. And the answer would be, “No, I do not.” I believe it’s more likely than not, but it does not reach that — that particular level.
Transcript, 109-110
Q: Did I understand you to say that you do not hold an opinion, to a reasonable degree of behavioral neuroscience certainty, that an increase in seratonin levels causes PPH?
A. I can’t point to a single study which would give me a statistically significant result. But what I can point to are a converging set of studies that, in fact, point to that. That make it more likely than not.
Q: And, Dr. Wellman, do you have an opinion to a reasonable degree of behavioral neuroscience certainty that phentermine increases seratonin level?
A: You would have to characterize it. Would it be phentermine alone or phentermine in combination with fenfluramine?
Q: Let me ask both questions to you. If you would address the first, please, Doctor.
A: I do not have a study that I can point to of phentermine alone, in terms of plasma seratonin. So, I hold that to “more likely than not,” but not to a scientific certainty.
Q: And whether you have an opinion to, again, a reasonable scientific certainty as to whether phentermine in combination with fenfluramine increases seratonin level?
A: That’s a scientific degree, sir. A scientific degree of certainty. In animals, two separate studies now, animals exposed to a combination of fen-phen show greater changes in seratonin than animals exposed to either fenfluramine or to phentermine.
Transcript 117-119
Thus, Dr. Wellman acknowledges that he holds certain critical opinions in this case with less than a reasonable degree of scientific certainty. Those opinions include whether phentermine causes primary pulmonary hypertension, whether phentermine in combination with fenfluramine increases the risk of developing pulmonary hypertension, whether an increase in seratonin levels causes pulmonary hypertension, and whether phentermine alone increases seratonin levels.
The parties agree that an expert should be able to testify “to a reasonable degree of scientific certainty,” but they dispute what constitutes that level of certainty. Plaintiffs urge that, because this is a civil trial, the standard for the admissibility of expert testimony should be the civil standard of proof, variously expressed by plaintiffs as a preponderance of the evidence, more likely than not, or, expressed numerically, 51%. The plaintiffs argue that “potential confusion may arise when a scientific assertion is uncertain from a scientific standard, yet supported by persuasive evidence, and therefore probable.” Fisons, on the other hand, argues that the plaintiffs confuse the standard for admissibility of expert testimony with the standard for the burden of persuasion before a jury. See Mitzelfelt v. Kamrin, 549 A.2d 935, 938 (Pa. Superior Court 1988), reversed on other grounds, 584 A. 2d 888 (1990).
The plaintiffs cite several cases in support of their contention that, in a civil case, the proper interpretation of “reasonable degree of medical certainty” is “more likely than not.” See Resendes v. Boston Edison, 38 Mass. App. 344, 352 (1995) (plaintiffs expert’s testimony concerning the “likely” cause or causes of plaintiffs injuries was properly admitted). Similarly, *48 “situations in which the failure to quality the opinion have resulted in exclusion are typically those in which the expert testimony is speculative, using such language as ‘possibility’.” See Schulz v. Celotex Corp., supra, at 207. See, generally, Liacos, Handbook of Massachusetts Evidence, §7.6 (1994).
It is well understood that expert testimony can be powerful, and at times decisive, evidence. There are a number of reasons for this in addition to the general level of respect with which science is held in our society. “Unlike an ordinary witness ... an expert is permitted wide latitude to offer opinions, including those that are not based on first hand knowledge or observation . . . Presumably this relaxation of the usual requirement of first hand knowledge ... is premised on an assumption that the expert’s opinion will have a reliable basis in the knowledge and experience of his discipline.” Daubert at 592. If the jury believes the expert’s opinion, they may find as fact what the expert offers as opinion. See Schulz v. Celotex Corp., supra, 942 F.2d at 204 (“. . . the intent of the law is that if a physician cannot form an opinion with sufficient certainty so as to make a medical judgment, neither can a jury use that information to reach a decision”). See also Mitzelfelt v. Kamrin, 549 A.2d 935, 939 (1989) (if medical expert cannot form opinion with sufficient certainty to make a medical judgment, there is no basis for the jury to make a a legal judgment with sufficient certainty).
Dr. Wellman’s proposed testimony in this case does not relate to the application of a body of scientific knowledge to a set of complex facts presented by a particular plaintiffs set of circumstances. In Blood v. Lea, 403 Mass. 430 (1998), for example, the Supreme Judicial Court permitted a medical expert to testify that the delay on the part of another doctor and a hospital “probably contributed” to the damage to a baby’s brain. The expert in question in that case was applying his experience and knowledge to a complex fact pattern involving alleged delay in recognizing the significance of fetal monitoring patterns displayed after admission to the hospital. “More probable than not” opinion on the application of science to a set of facts may well comply with Daubert and Lanigan.
In this case, however, Dr. Wellman’s opinions relate only to scientific principles and scientific research— namely, whether elevated seratonin levels in the human body cause pulmonary hypertension and whether phentermine (alone or in combination with fenfluramine) increases levels of seratonin in the human body. When a witness testifies as to the principles and methodologies applicable to a particular scientific field — what might be termed pure science— that witness must testify with reasonable scientific certainty. Reliability under the rationale of Lanigan, 419 Mass. at 26 (the ultimate test is the reliability of the theory or process underlying the expert’s testimony) and Daubert requires no less before potentially critical expert testimony may come before the jury. “The objective of [Daubert's gatekeeping requirement] ... is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire Co. v. Carmichael, 119 S. Ct. 1167, 1176 (1999). See also Rosen v. Ciba-Geigy Corp., 78 F. 3d 316 (7th Cir. 1986) (“The object [of Daubert] . . . was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work”).
Doctor Wellman proposes to testify as to scientific knowledge and principles. His testimony will not seek to apply scientific knowledge and principles to the facts of this case. Although an expert’s opinion as to the application of science to the facts of a case may be offered on the basis of probability, reasonableness and likelihood, the scientific principles or knowledge on which those opinions are based must be held with a reasonable degree of scientific certainty. That level of certainty, while it need not be absolute,[8] must be greater than “more likely than not.”
ORDER
For the foregoing reasons, defendant Fison’s motion to exclude the expert testimony of Dr. Wellman regarding the effect of phentermine, either alone or in combination with fenfluramine, on the development of pulmonary hypertension is ALLOWED.

By agreement of the parties, Dr. Wellman testified for the plaintiffs with the understanding that the court’s ruling on his testimony would also apply to Dr. Woolf.

Dr. Wellman’s testimony addressed the synergistic effect of phentermine. In a previous affidavit, however, he stated that "fenfluramine increases plasma levels of seratonin in animals and humans, and based on the known pharmacology of phentermine, we can predict that fen-phen will at least prolong, if not increase, that effect.”

When questioned at the hearing, Dr. Wellman acknowledged that some of the cases on which he relied might be duplicative.

An MAOI prevents the deactivation of seratonin by mono-amine oxidase (“MAO”) enzymes in the liver and lung, thus increasing seratonin levels.

One of defendant's experts, Dr. Nancy Balter, testified, for example, that although Aminorex had been shown to cause pulmonary hypertension in humans, it had not been found to cause pulmonary hypertension in animals.

“Of course, it would be unreasonable to conclude that the subject of scientific testimony must be ‘known’ to a certainty; arguably, there are no certainties in science.” Daubert at 590.